[No. F020022. Fifth Dist. Feb. 28, 1995.]

STANISLAUS AUDUBON SOCIETY, INC., Plaintiff and Appellant, v. COUNTY OF STANISLAUS et al., Defendants and Respondents; WILLMS RANCH, Real Party in Interest.

**COUNSEL**

Remy & Thomas, J. William Yeates, James G. Moose and Matthew R. Campbell for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Assistant Attorney General, Richard M. Thalhammer, Deputy Attorney General, Marcia Steinberg, Dale Will, Nancy N. McDonough and David J. Guy as Amici Curiae on behalf of Plaintiff and Appellant.

Michael H. Krausnick, County Counsel, and E. Vernon Seeley, Assistant County Counsel, for Defendants and Respondents.

Neumiller & Beardslee, Steven A. Herum and Thomas H. Terpstra for Real Party in Interest.

**OPINION**

**BUCKLEY, J.**—Appellant Stanislaus Audubon Society, Inc., appeals from the judgment denying its complaint and petition for writ of mandate which

challenged approval by respondent County of Stanislaus (County) of a proposed project by real party in interest Willms Ranch (Willms) to construct a golf course and attendant facilities. Appellant argues the County's certification of a negative declaration for the proposed project and its finding the project is compatible with a Williamson Act land contract designation constitute prejudicial abuses of discretion.

Two primary issues are submitted for resolution by this court: First, whether there is any credible evidence in the administrative record which indicates that the proposed golf course may have a significant impact on the environment; second, whether the board's determination that the golf course was compatible with the purposes of the Williamson Act is supported by substantial evidence in the record. Our affirmative conclusion on the first issue obviates discussion of the second.

In this opinion, we hold that appellant met its burden of establishing that the record contains substantial evidence sufficient to support a fair argument that the project may have a significant growth-inducing effect. Therefore, the court erred in denying a writ of mandate to void the board of supervisors' adoption of a negative declaration and approval of the project.

### STATEMENT OF FACTS

On March 30, 1989, Willms applied for a use permit from the County for the development of a "semi-private/public golf course with related facilities." The completed project will consist of a 27-hole golf course, putting greens, driving range, 4 tennis courts, swimming pool and cabana, maintenance building and a clubhouse. In addition to locker rooms and showers, the clubhouse will contain meeting facilities, offices, pro shop, lounge and a restaurant. The hours of operation of the proposed country club[1] are initially to be from sunrise to sunset; however, after completion of the clubhouse, the hours of operation for the restaurant and lounge "could" extend to 8 p.m. during the winter months and 10 p.m. during summer months. "Periodic special events could cause the clubhouse to remain open as late as 11 PM."

The project site is approximately 600 acres located within the 2,500-acre Willms. The site is located "at the southwestern intersection of State Highway 108/120 and Willms Road, south of Knights Ferry." The subject parcel

---

[1]The term "country club" is defined as "a social club, usually in the outskirts of a city, equipped with a clubhouse, golf course, etc." (Webster's New World Dict. (2d college ed. 1982) p. 325.) Appellant refers to the proposed project as a "resort." The County and Willms characterize it as a "golf course project." Neither term correctly describes the proposed project. The proposed project is accurately defined as a country club and therefore will be referred to as such throughout this opinion. The term "country club" has been selected only because it most fully and correctly describes the proposed project; no value judgments are intended by the use of this term.

is currently used for dry land grazing. "Generally, the surrounding area can best be described as rolling foothills of the Sierra Nevada. The predominate [*sic*] land use is dry land grazing with limited irrigated pasture. The area is basically uninhabited with ranch sites being scattered throughout the country side. The nearest community is Knights Ferry to the north." The project site and surrounding lands are subject to a Williamson Act land contract. (See Gov. Code, § 51200 et seq.)

On August 11, 1989, the County's department of planning and community development (planning department) prepared an initial study on the proposed project. In relevant part, the initial study concluded, "this project may, indeed, have a significant growth inducing impact," and that no mitigation measures were available to avoid this impact.

On August 16, 1989, Willms was notified it had been determined the proposed project may have a significant effect on the environment and, unless appropriate mitigation measures are incorporated, preparation of an environmental impact report (EIR) will be required as a prerequisite of further consideration of the project application. Among the nine identified "areas of concern" were "Growth Inducement" and "Traffic/circulation."

On November 13, 1990, Willms submitted a report entitled "Property Owners Statement WILDCAT CREEK at Willms Ranch."

On October 1, 1991, the planning department completed a revised initial study. In relevant part, it stated "growth inducement" will generate "significant public concern." In relation to this issue, the revised study declared, "[a]n early criticism of this project was the potential for a golf course of this nature to attract housing to the area. Staff fully recognizes that golf courses often attract housing, but in this case we believe that the housing can be evaluated as it is proposed, rather than requiring a full evaluation of potential future housing around this project along with this project." No mitigation measures were deemed necessary.

On October 17, 1991, the planning commission conducted a public hearing, adopted a negative declaration and approved use permit No. 89-21. Appellant and others appealed the decision to the County Board of Supervisors (board) and a hearing was scheduled for December 17, 1991. Meanwhile, a "wildlife assessment" containing some additional mitigation measures was submitted by Willms to the County. The December 17, 1991, hearing was canceled because the County realized it had failed to circulate the negative declaration for public comment.

On January 21, 1992, the California Department of Conservation (CDOC) submitted a memorandum expressing concern with the "growth-inducing

impacts" of the project and stating the proposed country club is not consistent with a Williamson Act designation.

During the circulation period Willms requested that the mitigation measures recommended in the wildlife assessment be incorporated into the negative declaration. The negative declaration was modified and resubmitted to the state clearinghouse on February 28, 1992.

On March 23, 1992, the CDOC commented on the modified negative declaration, reiterating that preparation of an EIR was necessary. In relevant part, the CDOC wrote the planning commission's decision in the revised study not to require a full evaluation of potential future housing around the proposed project, but, rather, to consider such development as it was proposed, had led to an inadequate assessment of the growth-inducing impacts of the project.

On April 16, 1992, the planning commission conducted a public hearing on the proposed project as modified.[2] It ordered the filing of the modified negative declaration and approved use permit application No. 89-21. Appellant and others appealed the decision to the board.

On June 9, 1992, the board conducted a public hearing, denied the appeal and approved staff's recommendation to make findings of fact in support of its decision. On June 16, 1992, the board adopted findings of fact and statement of decision. In relevant part, it found there was no substantial evidence the proposed project would have a significant adverse growth-inducing impact and the project was compatible with a Williamson Act land contract designation.

On July 16, 1992, appellant filed the petition at issue. Hearing thereon was held on December 16, 1992, and the petition was ultimately denied. This appeal followed.[3]

DISCUSSION

*Adoption of a Negative Declaration*

A. *Standard of review.*

 Appellant contends the adoption of a negative declaration violated the California Environmental Quality Act (CEQA) (Pub. Resources Code,

---

[2]Modifications to the proposed country club and mitigation measures did not change the essential components of the project.

[3]We granted leave to CDOC and the California Farm Bureau Federation and Stanislaus County Farm Bureau to file amicus briefs in support of appellant; however, their briefs deal primarily with the Williamson Act issue, which we need not reach.

§ 21000 et seq.) because the record contains substantial evidence supporting a fair argument the proposed country club will have a significant adverse growth-inducing impact on the environment. It points out that after the planning department identified growth inducement as a significant environmental effect of the proposed project and concluded this effect was not amenable to mitigation, it made the erroneous decision to defer evaluation of this environmental impact to sometime in the future when "the housing can be evaluated as it is proposed." As a result, appellant concludes the County's adoption of a negative declaration for the proposed project violated CEQA and constitutes a prejudicial abuse of discretion. County and Willms dispute the existence of evidence demonstrating the proposed country club may be growth inducing. As will be explained below, appellant's position is persuasive.

The parties first quarrel over the applicable standard of review. However, this issue has recently been settled. In *Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas* (1994) 29 Cal.App.4th 1597 [35 Cal.Rptr.2d 470] (hereafter *Quail Botanical Gardens*), the applicable principles were clearly explained:

"CEQA requires a governmental agency [to] prepare an environmental impact report (EIR) whenever it considers approval of a proposed project that '*may* have a *significant* effect on the environment.' (§ 21100, italics added.) In addition to the intent to require governmental decisionmakers to consider the environmental implications of their decisions, the Legislature in enacting CEQA also intended to provide certain substantive measures for protection of the environment. . . .

"If there is no substantial evidence a project 'may have a significant effect on the environment' or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. (§§ 21080, subd. (c), 21064.) However, the Supreme Court has recognized that CEQA requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.] Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified." (29 Cal.App.4th at pp. 1601-1602.)

■ When a challenge is brought to an agency's determination an EIR is not required, "the reviewing court's 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made.'" (29 Cal.App.4th at p. 1602, fn.

omitted.) The "fair argument" test is derived from Public Resources Code section 21151. This section "creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted." (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1317 [8 Cal.Rptr.2d 473].) "If there is substantial evidence of a significant environmental impact, evidence to the contrary does not dispense with the need for an EIR when it still can be 'fairly argued' that the project may have a significant impact." (*City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 540 [230 Cal.Rptr. 867]; *Pistoresi* v. *City of Madera* (1982) 138 Cal.App.3d 284, 288 [188 Cal.Rptr. 136].) However, contrary evidence is considered in assessing the weight of the evidence supporting the asserted environmental impact. (*Lucas Valley Homeowners Assn.* v. *County of Marin* (1991) 233 Cal.App.3d 130, 142 [284 Cal.Rptr. 427].)

Application of this standard is a question of law and deference to the agency's determination is not appropriate. Rather, we independently "review the record and determine whether there is substantial evidence in support of a fair argument [the proposed project] may have a significant environmental impact, while giving [the lead agency] the benefit of a doubt on any legitimate, disputed issues of credibility." (*Quail Botanical Gardens, supra,* 29 Cal.App.4th at p. 1603; see also *Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at pp. 1317-1318.) An agency's "decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1318.) The appellate court conducts a de novo review of the record. "[T]he trial court's findings are not dispositive." (*Id.* at p. 1321.)

To the extent appellate districts were in conflict as to the exact standard of review, this issue was resolved by *Quail Botanical Gardens, supra.* There, the Fourth District Court of Appeal "abandoned" the standard it had applied in *Uhler* v. *City of Encinitas* (1991) 227 Cal.App.3d 795 [278 Cal.Rptr. 157], stating it had "mistakenly appli[ed] the deferential substantial evidence standard of review" (29 Cal.App.4th at p. 1603), and expressly adopted the position expressed by the First District in *Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th 1307. (29 Cal.App.4th at p. 1602.) Moreover, the court explained that the deferential manner in which it had applied the fair argument test in *Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 750 [198 Cal.Rptr. 100], may have been dicta because there was no real evidence, other than the plaintiff's opinion, that the proposed project would have a significant effect on the environment. (29 Cal.App.4th at p. 1603.)

■ Much of the instant dispute stems from the unreasonable definition respondents appear to give to the term substantial evidence, equating it with overwhelming or overpowering evidence. CEQA does not impose such a monumental burden on appellant. Rather, substantial evidence is simply evidence which is of " 'ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " (*Lucas Valley Homeowners Assn.* v. *County of Marin, supra*, 233 Cal.App.3d at p. 142.) CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) state that " 'Substantial evidence' " is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).) Thus, respondents' attempt to persuade us to consider only "raw analytic data," and to require quantitative environmental studies definitively establishing the existence of the claimed environmental impacts is unpersuasive.

### B. *Growth-inducing effect.*

■ "A 'significant effect on the environment' is defined as 'a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment.' [Citations.]" (*Oro Fino Gold Mining Corp.* v. *County of El Dorado* (1990) 225 Cal.App.3d 872, 881 [274 Cal.Rptr. 720].)

■ Applying the principles discussed above, it quickly becomes evident the record is replete with evidence supporting a fair argument the proposed country club may have a significant adverse growth-inducing effect on the surrounding area and that the County avoided evaluation of this impact by specifically deferring consideration thereof until the expected housing developments are actually proposed. While it can be argued that no single piece of evidence standing alone requires preparation of an EIR, when the record as a whole is studied, the collective weight of the evidence supporting appellant's position is overwhelming.

Willms and the County seem to believe appellant bears the burden of providing extensive studies or expert testimony definitively proving the proposed country club *will* have a growth-inducing effect on the surrounding area or to present evidence demonstrating it had already spurred growth in the surrounding area. To the contrary, appellant is required only to demonstrate that the record contains substantial evidence sufficient to support a *fair*

*argument* that the project *may* have a significant growth-inducing effect. Appellant clearly met this burden.

Much of the evidence of the potential growth-inducing impact of the proposed country club was generated by the County itself. First, the initial study prepared by the County's planning department unequivocally states the proposed project may act as a catalyst to residential development:

"Although the project site as well as surrounding lands are covered by the provision of a Williamson Act Land Contract, staff cannot completely negate the possibility of future estate residential development.

"Experience tells us that quite often a golf course project of this nature acts as a catalyst which triggers requests for residential development. The applicants argue that this golf course i[s] designed as a 'stand alone' facility and residential development will not follow its implementation. Nevertheless, staff believes its [*sic*] important to address growth inducement as an indirect impact of this project. Staff's primary concerns relate to impacts of surrounding agricultural land, public services, traffic and wildlife.

". . . The 1,900 [plus/minus] acres still under the Willms family control could, as a result of golf course approval, subsequently be removed from agricultural production. In its place, the Willms family could cultivate housing tracts. Cumulatively, this concept of housing tract cultivation could spread to adjacent properties whose owners may decide cattle ranching is no longer economically viable. Supposing residential growth does follow this project, issues related to public services . . . , traffic and wildlife will most assuredly follow, as well." This discussion concludes, "[s]taff believes this project may, indeed, have a significant adverse growth inducing impact." No mitigation measures to reduce this impact to insignificance are available. "Primarily, the decision to allow future growth in this remote area lies in the Board of Supervisor' hands." In its discussion of the possible impacts of the project on surrounding agricultural practices, the initial study reiterates, "As stated previously under the Growth Inducement section of this report, project implementation could spur requests for ranchette development. Cumulative impacts associated with residential growth as well as golf course operation could have a significant adverse impact upon surrounding agricultural lands." Certainly a determination by the County's own planning department that the country club will be growth inducing should be given significant weight since its staff members are professionals in the field and are, presumably, well trained to recognize the environmental impact of proposed projects.

Immediately following completion of this initial study, the planning commission notified Willms it had made a preliminary finding the project may have a significant effect on the environment. The nine listed areas of concern included "Growth Inducement" and "Traffic/circulation."

In response to Willms's application, the County's department of environmental resources air pollution control district (APCD) commented, "[t]he economic pressure to approve development next to the golf course will be enormous. An example of the development that can happen once a golf course is installed in an agricultural area is the Del Rio Community. There is no guarantee that the intentions of the Willms family will not change or the property may change hands and the new owners may want to develop the property."

In the revised study dated October 1, 1992, the planning department reversed its earlier position that the growth-inducing effects of the project needed to be addressed, recommending deferral of study of the potential for additional development in the area resulting from approval of the proposed project until housing was actually proposed. During oral argument, Willms asserted that the revised study demonstrates the planning department ultimately concluded the proposed project would not have a growth-inducing impact. To the contrary, there is absolutely no indication in the revised study that additional consideration of the possible growth-inducing effect of the proposed project had resulted in a conclusion that the project would not, in fact, be growth inducing. In fact, it specifically states approval of the proposed project may set a precedent for growth not anticipated by the general plan, and admits that "[s]taff fully recognizes that golf courses often attract housing, but in this case we believe that the housing can be evaluated *as it is proposed. . . .*" (Italics added.) Thus, the revised initial study clearly reflects the planning department's continuing belief that the proposed project is growth inducing because it will spur proposals to develop housing in the area surrounding the proposed country club.

We also find to be unpersuasive Willms's argument that preparation of a *revised* initial study relegated the first initial study to oblivion. We analogize such an untenable position to the unringing of a bell. The first initial study is part of the record. The fact that a *revised* initial study was later prepared does not make the first initial study any less a record entry nor does it diminish its significance, particularly when the revised study does not conclude that the project would not be growth inducing but instead simply proceeds on the assumption that evaluation of future housing can be deferred until such housing is proposed.

Respondents' fallback position that the planning department is not qualified to render an opinion whether the county club will be growth inducing and that its opinion is not based on fact is equally meritless. In reaching its determination, the planning commission relied on documentation generated by the applicant, consideration of similar projects elsewhere and its own experience and training in this area. It is not unreasonable to presume the agency relied upon by the County to study and evaluate development proposals, in light of its prior experience in the area, has expertise upon the subject, is qualified to assess the data presented and to render opinions thereon. (See, e.g., Evid. Code, § 720.)

We also find it notable that at the October 17, 1991, hearing, planning commission member Hess stated, "we are fooling ourselves if we don't think [the project] is growth inducing. We will see and we will get pressured in that area of people who are going to want to live there and I frankly don't have a big problem with that because if we're going to put them somewhere, I'd rather put them there than in some of the farmland we're seeing." During oral argument Willms dismissed Hess's opinion as meaningless rambling; we do not agree. It is undisputed that members of the planning commission are experienced in matters of planning and development. The commission members reviewed the initial and revised initial studies as well as the documentation provided by Willms. Therefore, Hess's expressed opinion during a formal hearing that the project will be growth inducing is significant.

Thus, the County's planning department, the APCD and at least one member of its planning commission recognized the probable growth-inducing effect of the proposed project. The evidence discussed above does not consist of mere generalities. The planning department based its determination that the proposed project will be growth inducing on professional opinion and consideration of other development projects. The APCD gave a specific example in which construction of a golf course in an agricultural area had caused other development, the "Del Rio Community."

There is yet more documentation in the record demonstrating the project may induce growth in the surrounding area. For example, the County solicited an initial study prepared by Tuolumne County in connection with a golf course use permit application. The Tuolumne study considered a project similar to the "stand alone" country club at issue here except that the Tuolumne golf course was to have 18 rather than 27 holes. The Tuolumne study unequivocally concluded that the construction of a golf course and attendant facilities on the project site (which is comparable to the site under

consideration here) would have a growth-inducing effect on the surrounding area, writing:

"The proposed project will have a growth inducing impact on the surrounding properties. A golf course is often the catalyst that triggers future residential development in an area.

"One of the primary growth related concerns is the impact on agricultural lands. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"A second area of concern under growth inducement is the residential development that will likely occur near the golf course." The Tuolumne study concludes, "[t]he proposed project will likely induce growth in this predominately rural area." The traffic impact analysis also recognized the growth-inducing and cumulative traffic impacts of the proposed project.

Also, in response to the negative declaration, the California Department of Conservation submitted a memorandum to the County stating it believes the proposed country club has the potential to induce growth in the surrounding area, writing: "The Department is concerned that this project appears to be of a 'leap-frog' nature, since there is no contiguous development. Therefore, allowing this type of project in an area not adjacent to current development create[s] development pressures on adjacent farmland. Such growth-inducing impacts can have a particularly significant adverse impact [on] agricultural operations, particularly when they affect areas which are discontiguous from other urban development." In a second memorandum, the CDOC reiterated its opinion that preparation of an EIR was necessary, in part because the project "had the potential to induce growth in an area not contiguous to urban development." It also stated the planning department's decision in the revised study to defer evaluation of such probable future development was improper, writing, "[t]he basis for this conclusion is not evident, and cannot be considered an adequate assessment of the growth-inducing impacts of this project."

In response to the position expressed by the CDOC, respondents argue the proposed project will not be growth inducing because the acreage surrounding the site is subject to a Williamson Act land contract and is zoned for agricultural use. However, both the planning department and the APCD noted there is no guarantee the intention of Willms or its successors in interest not to develop the surrounding land will not change and it would therefore choose not to renew the Williamson Act land contract on the site

and surrounding acreage.[4] Moreover, we find it significant that Willms refused to accept addition of a condition to the use permit prohibiting subsequent development of homes on its land surrounding the property.

The current agricultural zoning of the surrounding acreage is also not determinative. Zoning is subject to change and amendment of a general plan is not a rare occurrence. The County admits rezoning and general plan amendments could be approved by the planning commission and board. Although we intend no aspersions upon the expressed intentions of the Willms family to preserve the agricultural character of their land, the record before us contains no assurances that the area surrounding the project will not one day be rezoned and the Williamson Act land contracts allowed to expire, thus permitting the residential development forecasted by the planning department and the CDOC.

Willms also points to contrary evidence allegedly demonstrating the project will not be growth inducing because it is modeled after the Chardonnay golf course, a "stand alone" facility in Napa. However, the record contains no documentation or testimony explaining the differences between the Chardonnay golf course and those in Del Rio and Oakdale, or why the latter two induced growth and, apparently, the former did not. During oral argument, Willms attempted to explain the similarities between the proposed project and the Chardonnay facility; however, we consider only the evidence in the record before us. There is no evidence *in the record* addressing, much less negating, the reasonable possibility housing will eventually spring up around the proposed country club here just as it did around the Del Rio and Oakdale golf courses. In addition, the golf course considered in the Tuolumne study was apparently also designed as a "stand-alone" facility; yet, as discussed above, the Tuolumne study concluded it will be growth inducing. There is no evidence in the record that the proposed "stand alone" country club at issue here significantly differs in concept from that considered in the Tuolumne study.

Willms refers us to the testimony of Keith Gurnee, Willms's consultant, at the April 16, 1992, hearing. However, Gurnee merely testified the project

---

[4]"The act empowers local governments to establish 'agricultural preserves' consisting of lands devoted to agricultural uses and other uses compatible therewith. (*Id.*, § 51230.) Upon establishment of such preserves, the locality may offer to owners of included agricultural land the opportunity to enter into annually renewable contracts that restrict the land to open space use for at least 10 years. [Citations.] In return, the landowner is guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential." (*Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 851 [171 Cal.Rptr. 619, 623 P.2d 180], fn. omitted.)

will not be growth inducing because it was designed by the same architect who designed the Chardonnay golf course, and because the Willms family has owned the property since 1852 and are "stewards" of the land who do not want to see it subdivided. He did not give factual testimony as to the differences between the proposed course and Del Rio and Oakdale nor did he explain in detail how the proposed course is similar to the Chardonnay facility and why the Chardonnay facility did not induce growth.

Finally, Willms asserts that an EIR is not necessary because the growth-inducing impacts of the proposed project are too "remote" and "speculative." This argument has been decidedly rejected in earlier cases. *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325 [232 Cal.Rptr. 507] (hereafter *Antioch*) is instructive. There, the appellate court found the adoption of a negative declaration for a proposed road and sewer construction project violated CEQA. Respondents argued that because the project involved no building construction and it was not known what type of development would occur, preparation of an EIR was not necessary. They also asserted an EIR need not be prepared because "proposals for future development will be subject to further environmental review at the time of development of the surrounding land." (*Id.* at p. 1333.) The appellate court rejected this argument, writing, "[c]onstruction of the roadway and utilities cannot be considered in isolation from the development it presages. Although the environmental impacts of future development cannot be presently predicted, it is very likely these impacts will be substantial." (*Id.* at p. 1336.) Thus, CEQA requires preparation of an EIR considering the "most probable development patterns." (*Id.* at p. 1337.)

*Antioch* is factually inapposite and distinguishable from the instant case on the ground that the sole reason to construct the road and sewer project was to "provide a catalyst for future development." (187 Cal.App.3d at p. 1337.) However, the central principle of the case, that environmental review cannot be deferred until reasonably foreseeable future development is, in fact, proposed, is directly applicable. "[T]he fact that future development may take several forms," or that it may never occur, "does not excuse environmental review" of the project which is the catalyst for the projected future growth. (*Id.* at p. 1338.) The record here clearly contains substantial evidence supporting a fair argument the proposed country club may induce housing development in the surrounding area. The fact that the exact extent and location of such growth cannot now be determined does not excuse the County from preparation of an EIR. Just as in *Antioch*, review of the likely environmental effects of the proposed country club cannot be postponed until such effects have already manifested themselves through requests for

amendment of the general plan and applications for approval of housing developments.[5] As we explained in *Pistoresi* v. *City of Madera, supra,* 138 Cal.App.3d at page 289, "[r]equiring [an EIR] early in the process enables decision makers to make determinations upon adequate data."[6]

No mitigation measures were adopted which reduce the growth-inducing effect of the project to insignificance. The initial study stated no mitigation measures were "available," and the revised study declared none was necessary. In the absence of mitigation measures reducing the adverse growth-inducing impact of the proposed country club to insignificance, the certification of the negative declaration and approval of the use permit constituted a prejudicial abuse of discretion. (*Antioch, supra,* 185 Cal.App.3d at p. 1338; *Quail Botanical Gardens, supra,* 29 Cal.App.4th at p. 1607; *Oro Fino Gold Mining Corp.* v. *County of El Dorado, supra,* 225 Cal.App.3d at p. 885.) "The negative declaration must therefore be set aside and the [county] ordered to prepare an EIR." (*Antioch, supra,* 187 Cal.App.3d at p. 1338.)[7]

In light of our holding, appellant's alternative contention that preparation of an EIR is necessary because of the potentially significant impacts of the proposed project on plant and animal life need not be considered. Moreover, as there is no certainty that after preparation of an EIR the County will approve the proposed project or that it will find the project to be compatible with a Williamson Act land contract designation, any discussion of this point would be mere dicta. Therefore, this issue will not be addressed further.[8] (*Quail Botanical Gardens, supra,* 29 Cal.App.4th at p. 1607, fn. 5; *Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1323; *Oro Fino Gold Mining Corp., supra,* 225 Cal.App.3d at p. 885, fn. 5; *Antioch, supra,* 187 Cal.App.3d at p. 1338.)

---

[5]Willms's reliance on *Leonoff* v. *Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337 [272 Cal.Rptr. 372] is misplaced. In *Leonoff,* the court found there was no substantial evidence of any potentially significant environmental effects; rather, the objectors' position was based on a "very selective, if not misleading, version of the evidence." (*Id.* at p. 1349.) In contrast, a fair reading of the record here reveals abundant evidence supporting appellant's contention the project may be growth inducing.

[6]We decline Willms's request, nay, demand, of this court to specifically explain what should be contained in the EIR, and refer counsel to our recent opinion on this subject in *San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713 [32 Cal.Rptr.2d 704].

[7]We are aware of certain planning commission members' opinions, expressed in the record, that preparation of an EIR "costs a hell of a lot of money," and is an exercise in futility because "it always ends up, . . . everything's mitigated. . . . It just made everybody feel better and in the long run, the projects still went." However, despite their collective opinion that preparation of an EIR is just "another big added expense," without commensurate benefits, compliance with CEQA is not optional.

[8]All requests for judicial notice made by the parties are denied.

DISPOSITION

The judgment denying the petition for peremptory writ of mandate is reversed and the cause is remanded to the Superior Court of Stanislaus County with directions:

1. To issue a writ of mandate directing respondent County to void its adoption of the negative declaration and approval of use permit No. 89-21 pending certification of a legally sufficient EIR;

2. To conduct a hearing for the limited purpose of determining whether appellant should be awarded attorney fees pursuant to Code of Civil Procedure section 1021.5, which request was initially included in the petition for writ of mandate, the amount thereof and the party or parties against whom they are to be assessed.

Costs are awarded to appellant to be apportioned equally between respondents and real party in interest.

Martin, Acting P. J., and Vartabedian, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 25, 1995. Mosk, J., was of the opinion that the petition should be granted.