[No. F022674. Fifth Dist. Jan. 4, 1996.]

SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER, Plaintiff and Appellant, v.
COUNTY OF STANISLAUS et al., Defendants and Respondents;
WESTERN STONE PRODUCTS, Real Party in Interest and Respondent.

610

COUNSEL

Richard L. Harriman for Plaintiff and Appellant.

Michael H. Krausnick, County Counsel, and E. Vernon Seeley, Assistant County Counsel, for Defendants and Respondents.

Rein & Abbott and Teresa Vig Rein for Real Party in Interest and Respondent.

OPINION

ARDAIZ, P. J.—Appellant San Joaquin Raptor/Wildlife Rescue Center (SJR) appeals from a judgment of the superior court denying SJR's petition

for writ of administrative mandamus. The petitioner challenged the issuance by respondent County of Stanislaus (County) to respondent Western Stone Products (Western Stone) of a use permit authorizing Western Stone to extract sand and gravel from a 20-acre area located near the Tuolumne River, and the County's adoption of a mitigated negative declaration for the project. The County conducted an initial study and concluded that Western Stone's project would not have a significant adverse effect on the environment if certain mitigation measures were incorporated into the project, and that therefore no environmental impact report (EIR) was required. We will affirm the judgment.

## APPELLANT'S CONTENTIONS

SJR contends that the superior court's denial of its petition for writ of administrative mandamus was erroneous for three reasons. First, SJR contends that the ruling was erroneous because evidence in the administrative record supports a fair argument that significant environmental impacts or effects may occur. Second, SJR argues that the County did not proceed in the manner required by law due to the County's alleged "failure to analyze and consider the cumulative on-site and off-site impacts of the project." Third, appellant contends that substantial evidence does not support the County's conclusion that the project was consistent with the County's general plan.

As we shall explain, we find no merit to any of these contentions.[1] After we first provide a brief overview of the project itself and of the procedural history of this case, and a brief overview of the California Environmental Quality Act, we will directly address each of SJR's contentions of error.

## THE PROJECT AND THIS LITIGATION

In November of 1988 Western Stone submitted to the County an application for a use permit to excavate sand, gravel and overburden from a 20-acre undeveloped site located on private property south of the Tuolumne River. Western Stone proposed to remove approximately 600,000 tons of sand, gravel and overburden from the site over a period of approximately 10 years. When the excavation was completed, Western Stone proposed to "reclaim" the area as a fish pond.

---

[1]Because we reject each of appellant SJR's contentions, we need not and do not address respondents' contention that the issues of the lawfulness of the County's adoption of a mitigated negative declaration and its granting of Western Stone's use permit are moot. Respondents argue that these issues are moot because the sand and gravel excavation at the project site had already been completed at the time of the August 1994 superior court hearing on SJR's petition for writ of administrative mandamus.

The initial study described the area surrounding the project site as follows: "Character of Surrounding Area: To the west is the Landmark Genetics Laboratory complex of buildings, including six residential structures along the bluff. To the south is an orchard with two residences along the bluff. To the north is a pond in an old gravel excavation. To the east is a reclaimed gravel pit now being farmed in alfalfa, a pond and the Western Stone Products processing plant. To the north of the ponds is the Tuolumne River."

The county planning commission approved the permit application and adopted a mitigated negative declaration in September of 1990. SJR objected to the approval of the application and appealed the planning commission's actions.

The County's board of supervisors set a hearing date of October 16, 1990, for SJR's appeal, but the hearing was continued three times as SJR negotiated with Western Stone and the County over SJR's concerns about the project. The appeal hearing eventually took place on March 12, 1991, and the County denied SJR's appeal.

SJR then filed in superior court a "Verified Petition and Complaint." The superior court sustained demurrers to this and to two subsequent amended pleadings. The superior court's February 1992 judgment against SJR was reversed by this court in an opinion issued by this court in (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (July 13, 1993) F017473 (nonpub. opn.). We need not recount here what we said in that opinion. It will suffice to say that although we agreed with the superior court that demurrers to eight of SJR's ten purported causes of action were properly sustained, we agreed with SJR that it had sufficiently stated causes of action seeking a writ of administratus mandamus on the basis of allegations that the County's initial study had failed to consider significant "cumulative impacts" of the project (second cause of action) and allegations that there was no substantial evidence to support the County's determination that the project was consistent with the County's general plan (fifth cause of action).

At the time of SJR's appeal in F017473, we were of course dealing only with the issue of the adequacy of the allegations of SJR's pleading. After remittitur issued, Western Stone answered SJR's second amended pleading. The superior court received further briefing, SJR lodged the administrative record with the court, and a hearing on SJR's petition for writ of mandate was held in August of 1994. The court took the matter under submission and then denied SJR's petition, and entered judgment against SJR.

THE CALIFORNIA ENVIRONMENTAL QUALITY ACT

The California Environmental Quality Act (commonly referred to as CEQA), Public Resources Code section 21000 et seq., was enacted in 1970.

The basic purposes of CEQA are (1) to inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities, (2) to identify ways that environmental damage can be avoided or significantly reduced, (3) to prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible, and (4) to disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental impacts are involved. (Cal. Code Regs., tit. 14, § 15002; see also Pub. Resources Code, §§ 21000-21002.)[2] CEQA applies to "projects" which involve "governmental action." (Guidelines, § 15002, subds. (b) and (d).) The term "project" is expansively defined to include many different types of action which have "a potential for resulting in a physical change in the environment, directly or ultimately . . . ." (Guidelines, § 15378; see also Pub. Resources Code, § 21080.) "Governmental action" may involve "(1) Activities directly undertaken by a governmental agency, [¶] (2) Activities financed in whole or in part by a governmental agency, or [¶] (3) Private activities which require approval from a governmental agency." (Guidelines, § 15002, subd. (b).)

Once there is a proposed project involving governmental action, the governmental agency conducts a "preliminary review" and determines whether there is any possibility that the activity in question may have a significant effect on the environment. (Guidelines, § 15061.) If "it can be seen with certainty" that there is no possibility of any such significant effect, then the proposed project is not subject to CEQA. (*Ibid.*) If there is a possibility of a significant effect, then the "Lead Agency" shall conduct an "Initial Study" to "determine if the project may have a significant effect on the environment." (Guidelines, § 15063.) The "Lead Agency" is the public agency which has the principal responsibility for carrying out or approving a project. (Guidelines, §§ 15367, 15050, 15051.)

If the agency's initial study determines that "there is substantial evidence that any aspect of the project, either individually or cumulatively, may cause

---

[2]Public Resources Code section 21083 authorizes the state's Office of Planning and Research to prepare, and the Secretary of the Resources Agency to adopt, "guidelines for the implementation of" CEQA by public agencies (Guidelines). These Guidelines are found at California Code of Regulations, title 14, section 15000 et seq., and section 15000 states that the Guidelines "are binding on all public agencies in California." Our California Supreme Court has stated on more than one occasion that " '[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' " (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

a significant effect on the environment, regardless of whether the overall effect of the project is adverse or beneficial," then the agency shall prepare an EIR. (Guidelines, § 15063, subd. (b).) "[I]f there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," then the agency shall prepare a "negative declaration." (*Ibid.*) A "negative declaration" is "a written statement by the Lead Agency briefly describing the reasons that a proposed project, not exempt from CEQA, will not have a significant effect on the environment and therefore does not require the preparation of an EIR." (Guidelines, § 15371.)

If an EIR is required, the lead agency prepares a "draft environmental impact report" (draft EIR) which is made available for public review. (Guidelines, §§ 15084, 15087.) The agency "shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response." (Guidelines, § 15088.) A "final EIR" is then prepared. (Guidelines, § 15089.) The "final EIR" is "an EIR containing the information contained in the draft EIR, comments either verbatim or in summary received in the review process, a list of persons commenting, and the response of the Lead Agency to the comments received." (Guidelines, § 15362, subd. (b).) The agency must certify that its "decision-making body reviewed and considered the information contained in the final EIR prior to approving the project." (Guidelines, § 15090.) Similarly, in those situations in which the agency determines that a negative declaration is appropriate, a proposed negative declaration is prepared (Guidelines, § 15070) and is made available for public review. (Guidelines, §§ 15072, 15073.)[3] The proposed negative declaration circulated for public review includes "[a]n attached copy of the initial study." (Guidelines, § 15071.) The decisionmaking body of the lead agency "shall consider the proposed negative declaration together with any comments received during the public review process." (Guidelines, § 15074.) The decisionmaking body "shall approve the negative declaration

---

[3]In some instances the initial study identifies "potentially significant effects" but determines that "[r]evisions in the project plans or proposals . . . would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur." (Guidelines, § 15070.) In this situation, when the negative declaration is circulated for review it must include these revisions, which are referred to in section 15071, subdivision (e) of the Guidelines as "[m]itigation measures, if any, included in the project to avoid potentially significant effects." Appellant's use of the term "mitigated negative declaration" or "MND" appears to refer to just this situation, i.e., when there are revisions or "mitigation measures" which are circulated for public review as part of the negative declaration. (See also fn. 1, *ante.*) The term "mitigated negative declaration" does not appear, however, in any of the Guidelines which pertain to the negative declaration process. (Guidelines, §§ 15070-15075.) The important point is that the initial study aids the agency in determining whether a project requires an EIR or whether instead a negative declaration will suffice. Those are the only two options. A negative declaration by any other name is still a negative declaration.

if it finds on the basis of the initial study and any comments received that there is no substantial evidence that the project will have a significant effect on the environment." (*Ibid.*) ■ " ' "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' " (*Citizens of Goleta Valley* v. *Board of Supervisors*, *supra*, 52 Cal.3d 553, 564, quoting *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].)

I.

■ We first address appellant's contention that the adoption of a mitigated negative declaration violated CEQA because the administrative record contains substantial evidence supporting a fair argument that the proposed project will have a significant effect on the environment.

Public Resources Code section 21100 states in part that "[a]ll lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment." Similarly, Public Resources Code section 21151 states in part that "[a]ll local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." Subdivision (b) of section 21151 states that "[f]or purposes of this section, any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5." Section 21060.5 defines "environment." It states: " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance."

In *Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas* (1994) 29 Cal.App.4th 1597 [35 Cal.Rptr.2d 470], the court explained the standard of review by which a court reviews a governmental agency's determination that no EIR should be required for a proposed project. The court stated:

"CEQA requires a governmental agency [to] prepare an environmental impact report (EIR) whenever it considers approval of a proposed project that '*may* have a *significant* effect on the environment.' (§ 21100, italics added.) In addition to the intent to require governmental decision makers to

consider the environmental implications of their decisions, the Legislature in enacting CEQA also intended to provide certain substantive measures for protection of the environment. . . .

"If there is no substantial evidence a project 'may have a significant effect on the environment' or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. (§§ 21080, subd. (c), 21064.) However, the Supreme Court has recognized that CEQA requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.] Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified." (29 Cal.App.4th at pp. 1601-1602.)

When a challenge is brought to an agency's determination an EIR is not required, ". . . the reviewing court's 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made.' " (29 Cal.App.4th at p. 1602, fn. omitted.) The "fair argument" test is derived from Public Resources Code section 21151. This section "creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted." (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1317 [8 Cal.Rptr.2d 473].) "If there is substantial evidence of a significant environmental impact, evidence to the contrary does not dispense with the need for an EIR when it still can be 'fairly argued' that the project may have a significant impact." (*City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 540 [230 Cal.Rptr. 867]; *Pistoresi* v. *City of Madera* (1982) 138 Cal.App.3d 284, 288 [188 Cal.Rptr. 136].) However, contrary evidence is considered in assessing the weight of the evidence supporting the asserted environmental impact. (*Lucas Valley Homeowners Assn.* v. *County of Marin* (1991) 233 Cal.App.3d 130, 142 [284 Cal.Rptr. 427].)

Application of this standard is a question of law and deference to the agency's determination is not appropriate. Rather, we independently "review the record and determine whether there is substantial evidence in support of a fair argument [the proposed project] may have a significant environmental impact, while giving [the lead agency] the benefit of a doubt on any legitimate, disputed issues of credibility." (*Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas, supra,* 29 Cal.App.4th at p. 1603; see also

*Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at pp. 1317-1318 [8 Cal.Rptr.2d 473].) An agency's "decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1318.) The appellate court conducts a de novo review of the record. "[T]he trial court's findings are not dispositive." (*Id.* at p. 1321.)

To the extent appellate districts were in conflict as to the exact standard of review, this issue was resolved by *Quail Botanical Gardens, supra.* There, the Fourth District Court of Appeal "abandoned" the standard it had applied in *Uhler* v. *City of Encinitas* (1991) 227 Cal.App.3d 795 [278 Cal.Rptr. 157], stating it had "mistakenly appli[ed] the deferential substantial evidence standard of review" (*Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas, supra,* 29 Cal.App.4th at p. 1603), and expressly adopted the position expressed by the First District in *Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th 1307. (*Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas, supra,* 29 Cal.App.4th at p. 1602.) Moreover, the court explained that the deferential manner in which it had applied the fair argument test in *Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 750 [198 Cal.Rptr. 100], may have been dicta because there was no real evidence, other than the plaintiff's opinion, that the proposed project would have a significant effect on the environment. (*Quail Botanical Gardens Foundation, Inc.* v. *City of Encinitas, supra,* 29 Cal.App.4th at p. 1603; see also *Stanislaus Audubon Society, Inc.* v. *County of Stanislaus* (1995) 33 Cal.App.4th 144, 149-152 [39 Cal.Rptr.2d 54].)

■ SJR's second amended petition for writ of administrative mandamus alleges that the project would have "cumulative effects on the riparian environment" and that these effects will be "significant" and require an EIR.[4] We may then fairly ask the obvious question—what are the "cumulative effects" SJR is concerned with? Does SJR contend that the project will have a significant adverse effect upon the air? The water? Plant life? Noise? Wildlife? Unfortunately, neither SJR's brief on this appeal nor the record of the administrative hearing provides any clear, intelligible answer to this question.

■ "Riparian" means "of, adjacent to, or living on, the bank of a river or, sometimes, of a lake, pond, etc." (Webster's New World Dict. (2d

---

[4]Appellant did not include this pleading as part of the clerk's transcript on this appeal. The pleading does appear in the clerk's transcript of appellant's prior appeal. (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus, supra,* F017473.) All parties have requested that we take judicial notice of the appellate record in F017473. We do so.

college ed. 1982) p. 1228.) ■ One might suspect, from appellant's name, that there might be a contention that the project would be detrimental to a certain bird population. The County's initial study stated that two biologists, Holman King and Tim Ford, had been consulted and that "[t]he proposal does not present a significant threat to plant or animal life." No evidence to the contrary was presented at the administrative hearing. SJR presented no witnesses other than SJR's representative, Lydia Miller. SJR's attorney did not appear at the administrative hearing, although the record shows that he was given ample notice of it. Ms. Miller requested a continuance of the hearing so that SJR could further "negotiate" with Western Stone.

Ms. Miller had written to the board on February 4, 1991, requesting a continuance of the scheduled February 15, 1991, administrative hearing. She stated in that letter that "there still exists areas of concern" and that SJR wished "further dialogue with Western Stone Products." After the hearing was continued to March 12, 1991, Ms. Miller wrote to the board on March 11, 1991, to say that "Western Stone continues to move prematurely this project forward, and has not communicated any new correspondence since February 14th, 1991." The March 11 letter also expresses a desire to continue "working with WSP on the outstanding issues and cumulative impacts." Ms. Miller was asked, at the March 12 hearing: "Could you define specifically the cumulative impacts that you cite? You stated somewhere right in the beginning that you wanted cumulative impacts analyzed. Could you define which cumulative impacts?" Her response was "Cumulative impacts to resources which would be wildlife habitat, water drain, land use, other industries that are competing within this river quarter, infrastructure, public health safety, air. I can go on."

We have already dealt with the uncontroverted showing of a lack of any adverse effect on plant and animal life. Notwithstanding this uncontroverted showing, Western Stone agreed at SJR's request to place "nesting boxes for bird species" at the site when the area was reclaimed. Also, a third biologist, Bill Loudermilk of the California Department of Fish and Game, testified at the administrative hearing in favor of the project and stated that "we see no significant impacts existing." Loudermilk also stated:

"It's our understanding that the landowner is desirous of having a good warm water fishery in the pond area after the project is completed, and many of the items that you see in the Reclamation Plan that's before you today, we think, probably will go a long ways towards creating a nice fishery there. There's substantial revegetation in the mitigation plan, the restoration plan.

There are monitoring requirements and, I guess, from the Department of Fish and Game standpoint, as long as the restoration plan features are implemented and monitored as proposed, we feel that it's appropriate that a negative declaration be issued."

The administrative record offers no clue as to what Ms. Miller meant by her concern about "water drain." SJR's 45-page brief on this appeal makes no mention of any problem with water drainage. We should perhaps add that although SJR's brief repeatedly mentions the Tuolumne River, nothing in the project really has anything to do with the water in the river. The project site is simply near the river. The initial study states that the project site "is within the 100 year floodplain of the Tuolumne River." Thus, once every 100 years the river will rise to a level which would cause it to reach the project site. Were this to occur, the damage presumably would be to the excavation project, not to the river.

Nor did Ms. Miller attempt to explain how there would be a significant adverse impact to "land use, other industries that are competing within this river quarter," or "infrastructure."

SJR's brief on this appeal now attempts to argue that the project would have significant "noise and vibration impacts." No such contention was raised by SJR, or by anyone else, at the administrative hearing. Noise was simply not an issue at the administrative hearing.

Absolutely no one complained about possible noise impacts from the project. Landmark Genetics had no objection to the project and in fact owned the land comprising the project site. SJR's appellate brief cites to two portions of the administrative record which SJR says support its argument. One is a discussion, in the initial study, not of noise at all but rather of whether vibrations from the sand and gravel trucks would cause soil erosion on a nearby escarpment. The other portion of the administrative record cited by SJR contains two noise level studies done in connection with the initial study. These were apparently satisfactory to all concerned because, as aforementioned, no one raised any concern about noise at the administrative hearing.

As for air, SJR did not attempt to explain at the administrative hearing how a fair argument existed that the project would have a negative impact on air quality. The initial study pointed out that "[g]ravel excavations often generate dust," but there is no indication that the dust would affect any area other than the gravel excavation area itself. To the extent that the sand and gravel trucks leaving the area might track dirt or dust onto nearby roads, the

initial report stated that "[s]ite and haul roads will be watered on a regular basis with a water truck." Linda Falasco, a witness who testified at the administrative hearing, similarly testified that "[d]ust will be controlled through the application of moisture, and the haul roads will be controlled through the application of moisture." The administrative record contains no record of any complaint, or even any expression of concern, by any nearby property owner or by any person frequenting any nearby property, that dust from the project would have any effect on nearby property or on the air breathed by anyone on any nearby property.

SJR then argues that "there was a conflict between experts regarding impacts," but fails to explain what evidence there was that Ms. Miller qualified as an expert on any topic, or what expert opinion she gave that conflicted with any other expert opinion. SJR argues that "Ms. Miller commented on the fact that there was no off-site biological resources inventory of the sensitive species, candidate threatened, or endangered species in the area, such as the Swainson's Hawk and the Sharp Shinned Hawk." What Ms. Miller actually said was "We also don't know whether or not the swains and hawks or other sensitive species, candidate threatened or endangered species are in this area because we don't have this inventory." Putting aside for a moment the fact that Ms. Miller was not shown to be an expert, what we have are the opinions of three biologists (Holman King, Tim Ford, and Bill Loudermilk) that there will be no significant adverse impact on plant or animal life versus the statement of Ms. Miller that she does not know whether swains or hawks or any other sensitive species even exist "in this area." This is not a conflict of opinion. It is a unanimous opinion which SJR seeks to challenge with a statement saying in essence "I know nothing."

SJR also argues that "serious public controversy is present" but does not attempt to explain the significance of this argument or even cite to evidence demonstrating the existence of any such controversy. SJR cites page 275 of the administrative record, which is the second page of a September 1990 county planning commission report about the proposed project. There is absolutely no mention there, or anywhere else in the administrative record, of any serious public controversy over this project. The best that can be said in this regard is that two persons appeared at the March 12, 1991, hearing to contest the granting of the Western Stone use permit. These were SJR representative Lydia Miller and a Mr. Ron Weekly of an entity called the Tuolumne River Action Committee. The administrative record contains no indication of how many members these organizations had, and no one who testified at the hearing said anything about any public controversy. Furthermore, even if there was any public controversy over this project, this would

not require the preparation of an EIR. Public Resources Code section 21082.2, subdivision (a) provided in March of 1991 that "[t]he existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence before the agency that the project may have a significant effect on the environment."[5]

In sum, the administrative record presents no substantial evidence to support a fair argument that the project may have a significant adverse environmental impact.

## II.

We now turn to SJR's contention that the County abused its discretion by not proceeding in a manner required by law. ■ Judicial review under CEQA " 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d 376, 392, fn. omitted.)

■ SJR argues that the County did not proceed in a manner required by law "due to the agency's failure to analyze and consider the cumulative on-site and off-site impacts of the project, pursuant to PRC section 21083(b) and CEQA Guidelines, section 15065(c) and Appendix G."

Public Resources Code section 21083 directs the Office of Planning and Research to prepare and develop guidelines for the implementation of CEQA by public agencies. The County is not the Office of Planning and Research and did not prepare and develop the CEQA Guidelines. Thus the County could not and did not violate Public Resources Code section 21083.

Subdivision (b) of Public Resources Code section 21083 directs the Office of Planning and Research to prepare and develop a particular guideline which presently appears as section 15065, subdivision (c) of the Guidelines. Section 15065 states in relevant part: "A lead agency shall find that a project may have a significant effect on the environment and thereby require an EIR

---

[5]Today, virtually the same language appears in subdivision (b) of Public Resources Code section 21082.2, which states: "The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment."

to be prepared for the project where any of the following conditions occur. [¶] . . . [¶] (c) The project has possible environmental effects which are individually limited but cumulatively considerable. As used in the [*sic*] subsection, 'cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." Kostka and Zischke, authors of Practice Under the California Environmental Quality Act (Cont.Ed.Bar 1995), say the following about section 150065, subdivision (c) of the Guidelines:

"A lead agency must find that a project may have a significant effect on the environment and must therefore require an EIR if the project's potential environmental impacts, although individually limited, are cumulatively considerable. Pub Res C § 21083(b); 14 Cal Code Regs § 15065(c). 'Cumulatively considerable' means that the incremental effects of a project are considerable when viewed in connection with the effect of past projects, other current projects, and probable future projects. Pub Res C § 21083(b); 14 Cal Code Regs § 15065(c).

"Substantial confusion exists about the scope of analysis of cumulative impacts required in an initial study. Many practitioners treat the question of whether impacts are 'cumulatively considerable' under 14 Cal Code Regs § 15065(c) as equivalent to 'significant cumulative effects' under 14 Cal Code Regs §§ 15130 and 15355, which govern the cumulative impacts analysis in an EIR. See §§ 13.35-13.49. According to this view, any contribution by a project, however small, to environmental conditions that are cumulatively adverse requires a finding that the project may have a significant cumulative impact. The problem with this view is that it would make the need for an EIR turn on the impacts of other projects, not on the impacts of the project under review.

"There appears to be a difference between the 'cumulative impacts' analysis required in an EIR and the question of whether a project's impacts are 'cumulatively considerable' for purposes of determining whether an EIR must be prepared at all. For purposes of an EIR, the Guidelines define the 'cumulative impact' from several projects as the change in the environment that results from the incremental impact of a project when added to other past, present, and reasonably foreseeable future projects. 14 Cal Code Regs § 15355.

"In contrast, under 14 Cal Code Regs § 15065(c), the lead agency decides whether the 'incremental effects' of the project under review are 'considerable.' To do so, the agency considers the effects of other projects, but only

as a context for considering whether the incremental effects of the project at issue are considerable. In other words, the agency determines whether the incremental impacts of the project are 'cumulatively considerable' by evaluating them against the backdrop of the environmental effects of other projects. *The question is not whether there is a 'significant cumulative impact' but whether the effects of the 'individual project are considerable.'* 14 Cal Code Regs § 15065(c). See *Leonoff v Monterey County Bd. of Supervisors* (1990) 222 CA3d 1337, 1358, 272 CR 372, 383 (impacts of project are not cumulatively considerable when there is no substantial evidence that any of incremental impacts of project are potentially significant). See also *Newberry Springs Water Ass'n v County of San Bernardino* (1984) 150 CA3d 740, 750, 198 CR 100, 105 (county need not consider cumulative effects of other dairies when it determined that dairy in question would have no significant effect)." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 6.55, pp. 298-299, italics added.)

SJR does not explain how the County purportedly violated Guidelines section 15065 subdivision (c). The initial study expressly concluded that the project would NOT have "impacts which are individually limited, but cumulatively considerable." SJR cites to a document in the administrative record, authored by a senior planner of the County's own planning commission, which states that there have been other sand and gravel excavations "in this area since the 1950's." Because the County's own planning department compiled the initial study, all this appears to tell us is that the County did indeed determine that the incremental effects, if any, of this project were not considerable when viewed in connection with the effects of past projects.

More importantly, however, for purposes of this case, when SJR's representative was asked point blank at the administrative hearing to define what she meant by "cumulative impacts," she responded: "Cumulative impacts to resources which would be wildlife habitat, water drain, land use, other industries that are competing within this river quarter, infrastructure, public health safety, air. I can go on."

At the end of the administrative hearing, one of the county supervisors expressly stated his dissatisfaction with the fact that SJR's appeal hearing had been postponed three times, and yet when the hearing finally took place, SJR failed to point out or present any evidence to support its contention that there were significant cumulative effects on the environment. Supervisor Simon stated that for a successful appeal "I think there has to be a reasonable degree of evidence before this Board that cumulative impacts exist." He added that "I, as one supervisor, would appreciate it if evidence were

presented instead of wild statements that impacts are not being met." He said "for those reasons, I would deny the appeal of the appellant."

The essence of SJR's contention appears to be that because the County did not conduct some sort of grand statistical analysis of the combined purported environmental impacts, if any, of all other sand and gravel projects, past present and future, along the Tuolumne River, then the County could not properly adopt a mitigated negative declaration for the project. No authority so holds. In *Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d 1337, the court rejected a similar contention made by an objector who argued that an initial study of a proposed project was deficient because the study did not include a "cumulative impact analysis considering the proposed adjoining mini-storage project." (*Id.* at p. 1345.) The court stated that "objectors' real challenge to the initial study is not that County completely ignored these impacts, but that it did not study them enough." (*Id.* at p. 1346.) The same may be said here. Western Stone and the County presented a wealth of evidence of no significant environmental impact, and the showing has not been countered with any contrary evidence. Instead, SJR merely argues that the County should have conducted other studies of other projects. "[W]e are aware of no authority supporting objectors' unstated premise that an initial study is inadequate unless it amounts to a full-blown EIR based on expert studies of all potential environmental impacts. If this were true, the Legislature would not have provided in CEQA for negative declarations." (*Id.* at p. 1347.)

In the present case, no evidence was presented of any "incremental effects" of the project that are "Considerable." (Guidelines, § 15065, subd. (c); 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra.*) We cannot say that the board here was required to conclude that this project had possible environmental effects which were individually limited but cumulatively considerable.

We should also add that even if the County's initial study had been defective, this would not, as SJR appears to assume, necessarily require a conclusion that the board erred in approving Western Stone's use permit application and in adopting the mitigated negative declaration. The lead agency made its determination not only on the basis of what was in the initial study, but also on the basis of comments received during the public review process. (Guidelines, § 15074, subd. (b); *Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at pp. 1347-1348.) At the March 12, 1991, appeal hearing, biologist Bill Loudermilk of the Department of Fish and Game testified that "[w]e see no significant impacts existing." This too was properly considered by the board in reaching its decision.

SJR's contention that the County failed to proceed as required by law because it failed to comply with "Appendix G" to the CEQA Guidelines is likewise without merit. SJR argues that the County violated subdivisions (c), (p), (u), (w) , (x) and (y) of Appendix G. Appendix G states in relevant part, "A project will normally have a significant effect on the environment if it will: [¶] . . . [¶] (c) Substantially affect a rare or endangered species of animal or plant or the habitat of the species. [¶] . . . [¶] (p) Increase substantially the ambient noise levels for adjoining areas. [¶] . . . [¶] (u) Disrupt or divide the physical arrangement of an established community; [¶] . . . [¶] (w) Conflict with established recreational, religious, or scientific uses of the area; [¶] (x) Violate any ambient air quality standard, contribute substantially to an existing or projected air quality violation, or expose sensitive receptors to substantial pollutant concentration; [¶] (y) Convert prime agricultural land to non-agricultural use or impair the agricultural productivity or prime agricultural land. . . ." After citing these subsections of Appendix G, SJR makes no attempt to explain how any of them were not complied with. Rather, SJR cites five pages worth of citations to the administrative record to document a fact which no one disputes, namely that there have been other sand and gravel excavations along the Tuolumne River. In this respect, SJR's argument may charitably be described as bordering on the frivolous.

The superior court did not err in rejecting SJR's contentions that Western Stone's permit should not have been approved, and the negative declaration should not have been adopted, because the County failed to proceed in the manner required by law.

## III.

Finally, SJR makes a conclusory, perfunctory argument that the County abused its discretion in approving the Western Stone use permit because sand and gravel mining in the project area is inconsistent with the County's general plan. SJR does not attempt, in support of this conclusory argument, to explain what the County's general plan says or how approval of the use permit was inconsistent with this general plan. The general plan is not part of the administrative record. Nor does SJR make any citation to the administrative record to attempt to show that the purported inconsistency of the project with the general plan was raised by SJR as an issue at the administrative hearing. ■ "We discuss only those arguments that are sufficiently developed to be cognizable." (*Page* v. *Superior Court* (1995) 31 Cal.App.4th 1206, 1214, fn. 5 [37 Cal.Rptr.2d 529].) "[A]n appellant has the burden of showing reversible error . . . ." (*Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].) SJR has shown no error.

The judgment is affirmed. Costs to respondents.

Vartabedian, J., and Harris, J., concurred.

A petition for a rehearing was denied February 1, 1996, and appellant's petition for review by the Supreme Court was denied March 20, 1996.