[No. A122242. First Dist., Div. Five. Oct. 30, 2009.]

STEPHEN WOLLMER et al., Plaintiffs and Appellants, v.
CITY OF BERKELEY et al., Defendants and Respondents;
1950 MLK, LLC, Real Party in Interest and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II. sections D. through and including F.1.

## Counsel

Stuart M. Flashman and Anna DeLeon for Plaintiffs and Appellants.

Zachary D. Cowan, Acting City Attorney, for Defendants and Respondents.

Baird Holm and David C. Levy for Real Party in Interest and Respondent.

## Opinion

**BRUINIERS, J.**—This case arises out of approval by the City of Berkeley and the Berkeley City Council (collectively, City) of use permits and zoning variances for a mixed-use development project consisting of residential units and retail commercial space. Appellants Stephen Wollmer and Neighbors for a Livable Berkeley Way (Wollmer)[1] appeal from a judgment denying their petition for writ of mandate seeking to overturn these approvals. They urge that the City's approvals violated the state density bonus law (Gov. Code, § 65915), Berkeley Municipal Code, and California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA). While we affirm in all respects, the published portion of this opinion addresses the interpretation and application of the density bonus law.

### I. Background

The development project (Project) at issue here, as approved, is a "five-story mixed-use development that includes ground floor retail uses, including a proposed Trader Joe's grocery store and 148 residential units," located on approximately one acre at the northwest corner of University Avenue and Martin Luther King Jr. Way in Berkeley. Twenty-two of the residential units are reserved for low-income households, and half of those units "must be reserved for very low income households under certain circumstances." The Project site is zoned "C-1, General Commercial."

In 2002, the Project was proposed in its initial iteration. That year, real party in interest 1950 MLK, LLC (MLK), submitted a development application to City for a mixed-use commercial and residential project. In response to City comments and objections, various changes were made. In 2004, MLK submitted a consolidated application for a mixed-use development with 186

---

[1] Wollmer is a residential tenant in property located on Berkeley Way, a street adjoining the development. Neighbors for a Livable Berkeley Way is identified as an unincorporated association of "residents of Berkeley Way and Berkeley residents, citizens, and businesspeople throughout the City who share an interest in maintaining the livability of Berkeley's residential neighborhoods." We refer to appellants collectively as "Wollmer."

residential units, as well as 71 parking spaces and 4,000 square feet of commercial floor area in the larger of the two buildings.[2] The City of Berkeley Zoning Adjustments Board (ZAB) reviewed the proposal and directed MLK to submit an alternative design addressing certain City and neighbor concerns, including parking, building height and massing, and useable open space.

In December 2005, MLK submitted an alternative design which reduced the number of housing units to 156. The new design included 14,390 square feet of commercial floor area and a total of 157 residential and commercial parking spaces. During the hearing process before the ZAB in 2006, MLK further revised its application, reducing the number of residential units to 148.[3] On December 14, 2006, the ZAB held a final hearing and on January 11, 2007, approved the Project subject to certain conditions. Wollmer appealed the ZAB decision to the Berkeley City Council.

Following a public hearing on July 16, 2007, the Berkeley City Council denied Wollmer's appeal, made findings from the evidentiary record, and approved the use permit for the Project, again subject to certain conditions. (City of Berkeley Res. No. 63,780-N.S.) As relevant here, the Project as approved included: adoption of a mitigated negative declaration (MND) under CEQA;[4] an award of 32 "mandatory" density bonus residential units[5] under Government Code former section 65915, subdivisions (b) and (g)(1);[6] an additional discretionary authorization of 25 density bonus residential units

---

[2] The consolidated application was submitted on August 31, 2004, and deemed complete on December 9, 2004.

[3] Public hearings were held before the ZAB on May 11, May 25, June 22, July 13, November 9, and December 14, 2006.

[4] The implementing guidelines for CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.; Guidelines) require the lead agency to "conduct an initial study to determine if the project may have a significant effect on the environment." (*Id.*, § 15063, subd. (a).) "A public agency shall prepare or have prepared a proposed negative declaration or mitigated negative declaration for a project subject to CEQA when: [¶] (a) The initial study shows that there is no substantial evidence, in light of the whole record before the agency, that the project may have a significant effect on the environment, or [¶] (b) The initial study identifies potentially significant effects, but: [¶] (1) Revisions in the project plans or proposals made by or agreed to by the applicant before a proposed mitigated negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and [¶] (2) There is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment." (*Id.*, § 15070.)

[5] As discussed *post*, the result of an award of "bonus units" is to allow construction of a project of higher density than would otherwise be permitted under local zoning ordinances.

[6] Unless otherwise specified, references to Government Code section 65915 shall refer to the version of the statute in effect at the time of the Project's use permit approval. (Gov. Code, former § 65915, as amended by Stats. 2005, ch. 496, § 2.) Where relevant, use of the word "current" in relation to this section shall refer to the version of the statute as amended by

under Government Code former section 65915, subdivision (n) and Berkeley Municipal Code section 23C.12.050; and provision for zoning variances from height and floor area ratio limitations (Berkeley Mun. Code, § 23B.44.010) and from front yard setback requirements (*Id.*, § 23E.04.050) along the abutting residential areas on the Berkeley Way boundary of the Project. The mitigation conditions of the MND included a requirement for full payment by MLK for a new traffic signal at the intersection of Berkeley Way and Martin Luther King Jr. Way, a traffic diverter, and a landscaped traffic barrier.

Wollmer then filed a petition for writ of mandate challenging the City's approval of the Project. The superior court denied the petition and entered judgment against Wollmer on June 16, 2008. This timely appeal followed. Wollmer did not seek interim injunctive relief, and the City and MLK represent that construction of the Project is underway.

## II. Discussion

Wollmer's challenge focuses on three aspects of City's approval of the Project: density bonus calculations, zoning variances granted, and adoption of an MND rather than requiring a full environmental impact report (EIR) under CEQA.

### A. *Standards of Review*

The grant of a land use permit or variance is an adjudicatory act, subject to review by administrative mandamus. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1211 [30 Cal.Rptr.2d 95].) "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); see Pub. Resources Code, § 21168;[7] *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 [43 Cal.Rptr.2d 170] (*Gentry*).)

---

Assembly Bill No. 2280 (2007–2008 Reg. Sess.) section 1, effective January 1, 2009. (Gov. Code, § 65915, as amended by Stats. 2008, ch. 454, § 1.)

[7] Public Resources Code section 21168 provides: "Any action or proceeding to . . . review . . . a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions

An appellate court's task in the review of a mandate proceeding is essentially identical to that of the trial court. (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1070 [52 Cal.Rptr.3d 312] (*American Canyon*).) Accordingly, "we review the agency's actions directly and are not bound by the trial court's conclusions. [Citations.]" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816–817 [65 Cal.Rptr.3d 251] (*Lagoon Valley*).)

We apply the same standard in our review of both the zoning and CEQA issues presented (*American Canyon, supra*, 145 Cal.App.4th at p. 1070; *Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 142 [284 Cal.Rptr. 427]), although our focus differs somewhat in considering the decision to forgo a full EIR due to the different evidentiary threshold.

A city's decision to rely on an MND under CEQA is reviewed for abuse of discretion under the "fair argument" standard. " ' "CEQA requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.] Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified." [Citation.]' [Citation.]" (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 899 [69 Cal.Rptr.3d 105]; see also Guidelines, § 15064, subd. (f)(1) ["if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect"].) " 'The fair argument standard is a "low threshold" test for requiring the preparation of an EIR. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review*.' " (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1331 [73 Cal.Rptr.3d 202] (*Grand Terrace*), quoting *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928 [21 Cal.Rptr.3d 791] (*Pocket Protectors*).) "When a challenge is brought to an agency's determination an EIR is not required, 'the reviewing court's "function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made." ' [Citation.]" (*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 150–151 [39 Cal.Rptr.2d 54].) "If such evidence exists, the reviewing court must set aside the agency's

of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court . . . shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

decision to adopt a negative declaration or a mitigated negative declaration as an abuse of discretion in failing to proceed in a manner as required by law. [Citation.]" (*Grand Terrace, supra*, 160 Cal.App.4th at p. 1332.)

As to the zoning issues, " '[a] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion. [Citations.]' " (*Lagoon Valley, supra*, 154 Cal.App.4th at p. 816.) "We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. [Citation.]" (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717 [29 Cal.Rptr.2d 182].) "This review is highly deferential to the local agency, 'recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" [Citation.]' [Citation.]" (*Lagoon Valley, supra*, 154 Cal.App.4th at p. 816.) We must "resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515 [113 Cal.Rptr. 836, 522 P.2d 12].)

With these standards of review in mind, we address Wollmer's contentions.

## B. *The Mandatory Density Bonus Calculations under Government Code Section 65915*

Wollmer first argues that the City improperly authorized 32 additional "bonus units" to the Project, in excess of what its own zoning ordinances and general plan would allow, by misapplying the density bonus law (Gov. Code, former § 65915).[8] In his view, the actual number of additional units mandated by the statute would be only 31 units. He maintains that this purported miscalculation arose from an erroneous determination of the actual number of units in the base project. We disagree.

■ The purpose of the density bonus law is to encourage and provide incentives to developers to include low- and moderate-income housing units in their developments. (§ 65913.) "In 1979, the Legislature added several

---

[8] All further undesignated statutory references are to the Government Code.

provisions to the Planning and Zoning Law (. . . § 65000 et seq.) to address the shortage of affordable housing in California. (. . . § 65913, subd. (a); [citations].) One of these statutes, Section 65915, offers incentives to developers to include low income housing in new construction projects. Although application of the statute can be complicated, its aim is fairly simple: When a developer agrees to construct a certain percentage of the units in a housing development for low- or very-low-income households, . . . the city or county must grant the developer one or more itemized concessions and a 'density bonus,' which allows the developer to increase the density of the development by a certain percentage above the maximum allowable limit under local zoning law. [Citation.] In other words, the Density Bonus Law 'reward[s] a developer who agrees to build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations.' (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1263 [2 Cal.Rptr.3d 739].)" (*Lagoon Valley, supra,* 154 Cal.App.4th at pp. 823–824; see Barclay, Curtin's Cal. Land Use and Planning Law (29th ed. 2009) ch. 20, p. 519.)

■ Former section 65915 provided for mandatory and discretionary density bonuses and set forth the requirements for each. "When an applicant seeks a density bonus for a housing development . . . that local government shall provide the applicant incentives or concessions for the production of housing units . . . as prescribed in this section. . . . [¶] (b)(1) A city . . . shall grant one density bonus, the amount of which shall be as specified in subdivision (g), and incentives or concessions, as described in subdivision (d), when an applicant for a housing development seeks and agrees to construct a housing development, *excluding any units permitted by the density bonus awarded pursuant to this section,* that will contain at least any one of the following: [¶] (A) Ten percent of the total units of a housing development for lower income households . . . ." (Former § 65915, subds. (a), (b)(1)(A), italics added.) The density bonus provided under the statute increases with the percentage and type of low-income housing units to be built, with the bonus ranging from a low of 5 percent to a maximum of 35 percent. (*Id.,* subd. (g)(1).) Where 20 percent of the base project consists of low-income housing units,[9] a developer must receive a 35 percent density bonus. (*Ibid.*)

---

[9] The relevant Government Code sections use the terms "total units" or "total dwelling units" to identify the denominator used in calculating the fraction of low- or lower-income housing units, and the corresponding number of bonus units to be provided. (See former § 65915, subd. (g)(5); current § 65915, subd. (b)(3).) The term "base project" was used in the administrative record below, and in the parties' briefing here, as an apparent term of art for this number, and we therefore follow that convention.

The *base* number of units in the Project is obviously critical to calculation of the density bonus mandated by the statute. The City defined the "base project" as consisting of the retail space with 91 residential units on the second and third floors. The 22 low-income units provided by the developer would equal 24 percent of that number, requiring the City to grant at least a 35 percent density bonus under former section 65915, subdivision (g)(1), and accordingly provide for a minimum density bonus of 32 units. Wollmer claims the base project actually consisted of 116 units: the original 91 *plus* 25 units allowed by the City as an additional discretionary density bonus under former section 65915, subdivision (n), and that the 22 low-income units included in the Project therefore comprised only 19 percent of the actual "base project" so calculated, failing to meet the 20 percent statutory threshold for the maximum allowance. Wollmer's calculation would entitle MLK to a mandatory density bonus of only 33.5 percent rather than 35 percent, and consequently 31 bonus units rather than 32 awarded by the City.

There are a number of difficulties with Wollmer's argument. The first and most apparent is the inconsistency in application of his arithmetic calculations. Although he insists that the "base project" must be considered as 116 units, he nevertheless arrives at his purported maximum number of 31 required bonus units by: (1) first measuring the 22 developer-provided low-income units against this larger total (to arrive at the 19 percent figure); (2) then applying the resulting 33.5 percent entitlement against *91 base units*, not 116. Using his 33.5 percent assumption against the 116 units that he argues must be considered as the "base project," the resulting density bonus would be 39 units—seven more than the City awarded.

■ Wollmer's position also is inconsistent with provisions of the density bonus law. The statute specifically excluded from the base development "any units permitted by the density bonus awarded pursuant to this section . . . ." (Former § 65915, subd. (b)(1).) In addition to mandating density bonuses based on the percentage of low-income housing units, former section 65915 also provided that "[n]othing in this section shall be construed to prohibit a city . . . from granting a density bonus greater than what is described in this section for a development that meets the requirements of this section . . . ." (Former § 65915, subd. (n).)

While Wollmer acknowledges this provision, he claims that it applies only to *mandated* bonus units, and that "extra units (such as the 25 involved here) granted locally without an ordinance" (underscoring omitted) are *not* excluded from the base project. This, he asserts, is because the 25 extra units were only authorized by, not awarded pursuant to, former section 65915, and were not awarded pursuant to any local ordinance but granted on an "ad hoc" basis. He provides no authority for his position, and recently our colleagues

in Division Three of this district in *Lagoon Valley, supra*, 154 Cal.App.4th 807, found arguments similar to those Wollmer advances here to be contrary to the intent and "spirit of the Density Bonus Law, which is designed to encourage, even require, incentives to developers that construct affordable housing." (*Id.* at p. 826.)

■ "[I]n our view the language of Section 65915 is clear and unambiguous. If a developer agrees to dedicate a certain percentage of the overall units in a development to affordable or senior housing, the Density Bonus Law requires the municipality to grant the developer a density bonus of *at least* a certain percentage, ranging from a low of 5 percent (for moderate-income housing) or 20 percent (for senior and all other affordable housing) to a maximum of 35 percent, depending on the number of affordable-housing units provided over the minimum number necessary to qualify for a bonus. (. . . § 65915, subd. (g).) Because the statute imposes a mandatory duty on local governments, and provides a means for developers to enforce this duty through civil proceedings (. . . § 65915, subd. (d)(3)), it is clear that 35 percent represents the maximum amount of bonus a city is *required to provide*, not the maximum amount a developer can ever obtain. The entire aim of Section 65915 is to provide incentives to developers to construct housing for seniors and low-income families. (See Stats. 1979, ch. 1207, §§ 1–6, p. 4738 [legislative findings and declarations supporting enactment of . . . § 65915].) It would undermine this policy to interpret subdivision (g) as imposing an absolute cap . . . .

■ "The plain language of Section 65915, subdivision (n) also supports our interpretation because it clearly states that Section 65915 may not be construed to prohibit a local government from granting a larger density bonus than is provided for in the Density Bonus Law. Nevertheless, appellant argues subdivision (n) applies only when a municipality enacts an ordinance to provide a higher density bonus. Thus, appellant insists, the density bonus awarded here violated Section 65915 because the City did not grant it by way of an ordinance. Nothing in the Density Bonus Law suggests that a municipality must enact an ordinance any time it wishes to provide more of a density bonus than is required by state law. If the Legislature had intended to require an ordinance in such situations, it could easily have said so, and it is not the court's place to insert words into the statute. ■ 'An appellate court should be "[loath] to construe a statute which has the effect of 'adding' or 'subtracting' language." [Citation.]' [Citations.] Moreover, setting up an additional hurdle for municipalities to clear (i.e., passing an ordinance) under these circumstances would be contrary to the spirit of the Density Bonus Law, which is designed to encourage, even require, incentives to developers that construct affordable housing." (*Lagoon Valley, supra*, 154 Cal.App.4th at pp. 825–826, brackets added.)

■ Likewise here, City's award of a separate density bonus of 25 units was not on an "ad hoc" basis, but pursuant to former section 65915, subdivision (n). The City was not required to enact a separate ordinance. Former section 65915 authorized it to award additional density bonus units in excess of the mandated number of density bonus units. Because the additional 25 units awarded by City under former section 65915, subdivision (n), are excluded from the calculation of the base number of residential units under former section 65915, subdivision (b)(1), the City correctly determined that the base project consisted of 91 residential units, and there was therefore no error in its calculation of the number of density bonus units.

## C. *The City's Grant of Variances and Discretionary Density Bonus Units.*

Wollmer also seems to assert that there was no substantial evidence supporting certain zoning waivers granted by City, including the grant of the additional 25 discretionary bonus units.[10] He further contends that the City improperly granted variances on the basis that the waivers were necessary to make the Project as a whole economically feasible. He argues that under former section 65915, subdivision (f), such concessions are appropriate only if necessary to make the *residential units* economically feasible, a determination that he insists is not supported by the evidence.

■ As discussed *ante*, the purpose of the density bonus law is to encourage the development of low-income housing units. Accordingly, when an applicant seeks a density bonus for a housing development that includes the required percentage of affordable housing, former section 65915 *required* that the city not only grant the density bonus, but provide *additional* incentives or concessions where needed based on the percentage of low-income housing units. (Former § 65915, subd. (a).) Additionally, under the law in effect at the time the Project was approved, a city was encouraged to grant a waiver or modification of its development standards (i.e., a variance) if it was necessary to make the housing units economically feasible. (Former § 65915, subds. (e), (f).)[11] Further, "In no case may a city . . . apply any

---

[10] Wollmer filed a motion seeking judicial notice of the pertinent portions of the Berkeley Municipal Code. We grant the motion and take judicial notice of all portions of the Berkeley Municipal Code cited herein. (See Evid. Code, §§ 451, subd. (a), 452, subd. (b).)

[11] Former section 65915, subdivision (f), required an applicant for additional variances or waivers from local development standards to show that the waiver was necessary to make the proposed housing units economically feasible. That requirement was deleted in its entirety by Assembly Bill No. 2280 (2007–2008 Reg. Sess.) section 1, effective January 1, 2009. As noted above, Wollmer argues that the economic feasibility analysis of the former section must be applied to the *housing units only*, in isolation from other nonresidential elements of the project. The City argues that the statutory amendment "moots" Wollmer's claim of misapplication of, or noncompliance with, this element of the statute. We need not address this argument, because we conclude that City made the analysis required under the former statute.

development standard that will have the effect of precluding the construction of a development meeting the criteria of subdivision (b) at the densities or with the concessions or incentives permitted by that section." (Former § 65915, subd. (e).)

Here, MLK requested certain "modifications of the City's development standards in order to provide the density bonus units granted under [section] 65915[, subdivision] (d)(3)." The requested modifications were "to reduce the required front yard to less than 15 feet (zero is proposed along Berkeley Way)[,] . . . [¶] . . . [¶] to allow a building more than four stories (five stories are proposed), . . . [¶] . . . [¶] to allow a Floor Area Ratio of more than 3.0 (3.3 is proposed), [and] to allow a building taller than 50 feet, (54 feet is proposed) . . . ." City found that the requested modifications were necessary to make the Project, including the 22 below market rate units, economically feasible, and allowed the modifications.

The City found that grant of the additional bonus units was required to make the Project, and thereby the housing units, economically feasible in part because of provision of a number of significant amenities that increased the cost of the Project, including: MLK's agreement to provide three more affordable units than required to qualify for the maximum mandatory bonus; a 20 percent reduction in the total number of units proposed (which would not be offset by commercial revenue); construction of a traffic diverter at a projected cost of $345,000; provision of space for an important community-serving commercial use (the grocery store); provision of commercial parking in excess of zoning requirements; and provision of underground parking for the residents.

With respect to the local code variances, the City made the following findings: "In accordance with . . . Section 65915, the Council hereby grants the requested Variances defined under [Berkeley Municipal Code section] 23B.44.010 to a) allow a building more than four stories tall (5 stories is proposed); b) allow a Floor Area Ratio [FAR] of more than 3.0 (3.2 is proposed); and to allow a building taller than 50 feet (54 feet is proposed) for the following reasons: [¶] A. . . . Section 65915[, subdivision] (e) allows an applicant to request waivers or modifications of development standards in order to construct a project proposed under State Density Bonus Law. Further, the law requires a local government to waive development standards if these standards would preclude construction of density bonus units in a particular proposed project (Section 65915[, subds.] (e), (k).) Furthermore, waiving development standards to allow for the desired design improvements has been the practice for many mixed-use projects in Berkeley. [¶] B. As explained in Finding 5, above, substantial evidence in the record demon-strates that the total of 57 density bonus units is required to make the project,

*including the provision of 22 below market rate units,* economically feasible. [¶] C. The density bonus units cannot be accommodated within the otherwise maximum allowable residential building envelope of the C-1 District, which allows three stories, or up to four stories with a Use Permit, and therefore the C-1 building height, story and FAR standards must be modified to allow a fifth story. Under the City's Zoning Ordinance, the fifth story requires a Variance. A Variance is the City's mechanism for identifying a modification of Zoning Ordinance lot development standards that cannot otherwise be allowed through another discretionary permit . . . . When the Variance is necessary to approve a modification or waiver under Section 65915[, subdivision] (e), it is not necessary for the City to make the Variance findings ([Berkeley Mun. Code, §] 23B.44.030) because Section 65915 requires the City to accommodate bonus units by waiving or modifying zoning standards. Consistent with the applicant's request and the ZAB's approval of the 148-unit design . . . the Council waives and/or modifies the applicable height limits, story limit, and FAR limit in the C-1 District to the extent necessary to accommodate these bonus units as designed, whether or not it is necessary to accommodate the density bonus in some other design, the Council waives and/or modifies the height limits, story limit, and FAR limit to allow for the improved design of the project. [¶] D. In response to concerns raised by the Zoning Adjustments Board and citizen concerns, the 148-unit design provides reduced and appropriately-scaled massing and height and other significant design features that result in a project that is sensitive to its lower density residential neighbors. This project is considered an affordable housing project and qualifies for a 35% density bonus . . . because it proposes to make more than 20% of the base project units (24%) affordable to lower income households. In addition, the project will comply with the City's Inclusionary Housing Ordinance, [Berkeley Municipal Code section 23C.12] . . . which requires that 50% of the inclusionary units must be affordable to very low income households, thereby providing deeper affordability than required by the State Bonus Density Law for half of the inclusionary units, which in turn requires the additional density bonus units to make the project, including the provision of all 22 below market rate units, economically feasible." (Italics added.)

Wollmer urges that these findings were inadequate because they "state that the [zoning] variances were necessary to accommodate the total of fifty-seven 'bonus' units that the City granted, and the bonus units, in turn, were required to make the [P]roject, not the residential units, economically feasible." (Underscoring & fn. omitted.) The City found, however, that the variances and additional density bonus units were required to make the Project, "*including* the provision of all 22 below market rate units, economically feasible." (Italics added.) The City in its findings outlined in detail the amenities to be provided by the developer in excess of legal requirements,

and the burdens and additional costs imposed on the Project by modifications and exactions required by the City, all of which increased the Project costs, and which cumulatively required concessions by the City to make construction of the Project *with* the 22 low-income units economically feasible.

Wollmer's tortuous analysis misses the point. Simply stated, the City found the variances and additional density bonus units were required to make the Project economically feasible. Had the City failed to grant the variances the result would "have the effect of precluding the construction of a development" (§ 65915, subd. (e)), which met the criteria of the density bonus law. If the Project as a whole was not economically feasible, then the below-market-rate housing units would not be built, and the purpose of the density bonus law to encourage the development of low- and moderate-income housing would not be achieved.

Wollmer fails to establish that the City has not proceeded in the manner required by law, that the order or decision is not supported by the findings, or that the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b); see *Gentry, supra,* 36 Cal.App.4th at pp. 1375–1376.)

D.–F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

 1. *Impact on Traffic and Parking**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

 2. *Environmental Impacts Based on "De Facto" Amendment to Berkeley Municipal Code*

Wollmer next contends that City's actions in accordance with section 65915, subdivision (n), constitute a "change in policy" and "de facto . . . amendment" to the Berkeley Municipal Code which must be evaluated under CEQA. He asserts the new policy was that City had "virtually free rein to grant any-sized density bonus, limited only by the discretion of the zoning adjustment board and/or city council." Wollmer claims this "change in policy" is evidenced by an internal Berkeley City Attorney memorandum and that the "approval of this Project thus signaled the adoption by the City of this new policy governing density bonuses."

---

*See footnote, *ante*, page 933.

Wollmer's argument is based on unsupported legal and factual premises. There is nothing in the record supporting his claim that City has a new policy giving it "free reign to grant any-sized density bonus . . . ." He has cited no legal authority for the proposition that a city's compliance with a state statute is a "de facto . . . amendment," nor that it is a "project" to which CEQA applies. The alleged "change in policy" he references was nothing more than a memorandum confirming the City's interpretation of subdivision (n) to section 65915, which clarified that local entities may grant a greater density bonus than mandated. Since its enactment in 1979, section 65915 has given local governments discretion to provide more developer incentives than required by its terms. Wollmer has failed to demonstrate any "change in policy," or that City's action in interpreting and complying with section 65915 is a "project" subject to the requirements of CEQA. (Guidelines, § 15378, subd. (b); see *Northwood Homes, Inc. v. Town of Moraga* (1989) 216 Cal.App.3d 1197, 1206–1207 [265 Cal.Rptr. 363].)

III. DISPOSITION

The judgment is affirmed.

Jones, P. J., and Needham, J., concurred.

On November 24, 2009, the opinion was modified to read as printed above.