Filed 4/28/14  Scivally v. City Council for the City of South Pasadena CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| RINER SCIVALLY et al.,<br><br>    Petitioners and Appellants,<br><br>    v.<br><br>CITY COUNCIL FOR THE CITY OF SOUTH PASADENA,<br><br>    Respondent;<br><br><br>SAM NICHOLSON et al.,<br><br>    Real Parties in Interest. | No. B242267<br><br>(Super. Ct. No. BS133948)<br><br><br><br>**ORDER MODIFYING OPINION NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on April 7, 2014, and not certified for publication, be modified as follows:

1.  On page 9, third paragraph, delete the sentence which reads as follows:  The problem with this argument is that Scivally has misstated the record.

The foregoing does not change the judgment.  Appellants' petition for rehearing is denied.

WOODS, Acting P. J.          ZELON, J.          SEGAL, J. (Assigned)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RINER SCIVALLY et al., | No. B242267 |
| Petitioners and Appellants, | (Super. Ct. No. BS133948) |
| v. | |
| CITY COUNCIL FOR THE CITY OF SOUTH PASADENA, | |
| Respondent; | |
| SAM NICHOLSON et al., | |
| Real Parties in Interest. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ann I. Jones and Joseph R. Kalin, Judges.  Affirmed.

Law Offices of Edward A. Hoffman and Edward A. Hoffman for Petitioners and Appellants.

No appearance for Respondent.

Jones & Mayer, Kimberly Hall Barlow and Krista MacNevin for Real Parties in Interest.

_____

*INTRODUCTION*

Although a number of neighboring property owners raised objections to a proposed development project, a city council issued a "negative declaration," meaning no environmental impact report would be prepared pursuant to the California Environmental Quality Act (CEQA, Pub. Res. Code, § 21000 et seq.). After their appeal of this decision was unsuccessful, the objectors filed a petition for a writ of administrative mandamus, but the trial court denied the petition. The adjacent property owners now appeal from the judgment subsequently entered. We affirm.

*FACTUAL AND PROCEDURAL SUMMARY*

**The Original Proposal**.

In December 2010, real parties in interest Sam Nicholson (the owner of property located at 923 El Centro Street in the City of South Pasadena) and Stargate Digital (Nicholson's tenant) applied to the City for the demolition of part of an existing commercial building (1,600 sq. ft.) and replacement with a 1,600 sq. ft. Craftsman-style commercial addition, construction of a 1725 sq. ft. wooden deck overhanging the surface parking area on the alley side of the property, and removal of existing trees.

The site is bordered by El Centro Street to the north, Meridian Avenue to the east, Throop Alley to the south and 923 El Centro Street (a condominium building with 16 residential units and 2 commercial units) to the west. The property is subject to the City's Mission Street Specific Plan (MSSP) which requires 4 parking spaces per 1,000 sq. ft. of commercial floor area (among other things). The location is also close to a Metro Gold Line Station. The City has enacted the Mission-Meridian parking permit program which distributes parking tags to local residents and businesses to identify cars which can park legally in the area.

**The December 7, 2010 Design Review Board (DRB) Proceedings.**

The City scheduled a Design Review Board (DRB) hearing on the Original Proposal for December 7, 2010. Pursuant to the City's Department of Planning and

Building requirements, the City mailed notices of hearing to residents and businesses within 300 feet on November 24. The outside of each envelope stated: "DESIGN REVIEW BOARD NOTIFICATION LEGAL NOTICE." However, the post office returned 38 envelopes, including all 16 notices sent to the occupants of 909 El Centro Street (923 El Centro's only adjacent neighbor), as undeliverable.

At the hearing, the DRB suggested changes to the proposal and asked the applicants to provide a revised design to the board at a meeting to be held on December 21.

**The December 21, 2010 DRB Meeting.**

At the continued meeting (with no further notice provided), the applicant developers presented a new proposal. According to the DRB's minutes, "The board stated that this was the first time viewing the design and agreed that the project was heading in the right direction and was better than the original proposal. The board asked that the architect work with staff on the zoning issues and formally submit the new proposal so they have time to review the plans."

**The January 4, 2011 DRB Meeting.**

The meeting's agenda for this date identified the original proposal rather than the "new proposal" presented as of December 21, and at the January 4 meeting, "The board agreed that [the architect's] alternative design was more appropriate than what was previously presented." However, the City's "Staff noted that this item would have to be re-noticed before the board can make a final decision since the project has been significantly changed."

**The March 1, 2011 DRB Meeting and the Expanded Proposal.**

According to the March 1, 2011 meeting agenda, the proposal ("First reviewed: 3/1/11") was now described as follows: "A proposal to demolish an existing 2,055 square foot structure and construct a new 4,375 square foot modern-style two story office/live-work building. The proposal consists of a 1,577 square foot office space to be

3

located on the first floor, and four live-work units totaling 2,798 square feet to be located on second floor. Eleven parking spaces are provided behind the first floor office space and beneath the second floor. Proposed exterior materials are: 1) brick veneer 2) stucco 3) stone veneer 4) aluminum windows 5) aluminum railings, and 6) metal and frosted glass gates (as seen from the back alley). The project requires variances for: 1) the street-facing side setback (Meridian Avenue side), and 2) the corner side/front setback (Meridian Ave./El Centro St.)."

At the meeting, the applicant "explained that the new design had to accommodate more open space, additional live-work units, and additional parking." Several members of the public appeared to comment on the project, raising such issues as the height of the project, access in the alley, street parking, privacy for the adjacent 909 El Centro residents and traffic. (Public objectors included appellants Pilar Ara, Linda Lau and Gabriel Lau.)

**The April 25, 2011 Planning Commission Meeting.**

On March 31, 2011, the City mailed out public notice of the "Proposed Negative Declaration, Variance and Design Review" of the 923 El Centro Project set for public hearing on April 25. In this notice, the project was described as follows: "A proposal to demolish an existing 2,055 square foot structure and construct a new 4,375 square foot contemporary-style two story, office/live-work building. The proposal consists of a 1,577 square foot office space to be located on the first floor, and two live-work units totaling 2,798 square feet to be located on second floor. Ten parking spaces are provided behind the first floor office space and beneath the second floor. Proposed exterior materials are: 1) brick veneer 2) stucco 3) stone veneer 4) aluminum windows 5) aluminum railings, and 6) metal and frosted glass gates (as seen from the back alley) . . . ." "After reviewing the Initial Study, the Planning and Building Department Director has determined that this project will not have a significant effect on the environment. Accordingly, a Negative Declaration has been prepared. Public comments will be

4

received by the City prior to final adoption of the NEGATIVE DECLARATION and action on the project, for a period of at least 20 days (from April 1, 2011 to April 25, 2011).

On April 25, 2011, the City took no action, continuing the matter to May 23. The environmental checklist prepared for the April meeting noting the project would include ten parking spaces.

**The May 23, 2011 Hearing.**

On May 4, the City's Planning and Building Department mailed notice of the May 23 hearing, describing the project as including nine parking spaces without otherwise addressing the further change to the parking specifications, continued the hearing and indicated no action had been taken.

The appellants attended the May 23 hearing and voiced the objections they had made to the DRB on March 1. The hearing was continued to June 27.

**The June 27, 2011 Hearing.**

Appellants Brian Shumake (trial counsel) and Pilar Ara objected to the expanded proposal again at the June 27 hearing, but it was approved by a vote of 3 to 0 (with nine parking spaces).

Appellants filed an appeal to the City Council which was subsequently denied on September 7, 2011.

**The Petition for Writ of Mandate.**

In October, Riner Scivally (a resident homeowner on Meridian Avenue), Pilar Ara (a homeowner on Meridian Avenue), Buster's Ice Cream Shop (an unincorporated business on Mission Street), Family Fair (an unincorporated business on Meridian Avenue), First Citizens Bank & Trust Company (the seller of all condominium units at 909 El Centro—the property adjacent to 923 El Centro), Kris Greene (resident of 909 El Centro, Unit 103), Gabriel Lau and Linda Lau (residents of 909 El Centro, Unit 201), Robert Lopez (homeowner and resident who works on Meridian Avenue), Stephen Lough

5

and Noelle Singh (residents of 909 El Centro, Unit 210), Nancy Martorano (homeowner and resident on Meridian Avenue), Clara Richards and Rene Richards (residents and homeowners who work on Meridian Avenue), Brian Shumake and Joan Shumake (residents of 909 El Centro, Unit 101), "Neighbors of Mission District" (an unincorporated association of residents and homeowners in the Mission District affected by the project's environmental impacts) and "Residents of 909 El Centro" (an unincorporated association of "the homeowners at the 18-unit condominium building that is located at 909 El Centro, which abuts the property line of 923 El Centro) filed a petition for writ of administrative mandamus against the City Council for the City of Pasadena (the City), alleging the City violated the California Environmental Quality Act (CEQA, Pub. Res. Code, § 21000 et seq. [all undesignated statutory references are to the Public Resources Code]), when it approved the Nicholson/Stargate Project and issued a Negative Declaration, instead of requiring an Environmental Impact Report (EIR).[1]  (We include all appellants in our further references to Scivally.)

Scivally argued the City had denied public participation, the alley was required to be 20 feet (not 15), the second floor live-work units allowed the project to violate necessary parking requirements, the Mission-Meridian Parking Permit program allows employees at the project to violate off-street parking requirements and these cumulative effects would have an adverse effect on the environment.

---

[1]     We received letters from Scott Tang, Brandon Butcher, Karen Neri, Stephen and Joanne Leedecke, Carrie Chan and Paul Nguyen and Barbara Goodson and Nigel Goodson, indicating these current or former residents of 909 El Centro do not wish to be parties to this appeal. We have also received correspondence from appellants' counsel (Edward A. Hoffman), indicating none of these individuals had contacted him in this regard but expressing no objection to the removal of Tang, Butcher, Chan and Nguyen as parties (after consulting with these former parties) and noting Karen Neri, Stephen and Joanne Leedecke, Barbara Goodson and Nigel Goodson were never named as parties.

At trial on the petition, the court issued a written ruling denying the petition in its entirety, finding no substantial evidence supporting a fair argument there were any adverse environmental impacts.

Scivally appeals.

### DISCUSSION

"The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] requires a public agency to prepare an environmental impact report (EIR) only on projects that may have significant environmental effects (§§ 21100, subd. (a), 21151, subd. (a))." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 (*Communities for a Better Environment*).)

"'[S]ignificant effect on the environment' (§§ 21100, subd. (a), 21151, subd. (a)) is defined as a 'substantial, or potentially substantial, adverse change in the environment' (§ 21068). If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(1); [3] *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal. Rptr. 34, 529 P.2d 66].) If the initial study instead indicates the project will have no significant environmental effects, the agency may, as the District did [in *Communities for a Better Environment,* and as the City did] here, so state in a

---

2     All further unspecified statutory references are to the Public Resources Code.

3     "The regulations guiding application of CEQA, found in title 14 of the California Code of Regulations, section 15000 et seq., are often . . . referred to as the CEQA Guidelines. 'The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' [Citation.]" (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 310, 319, fn. 4.)

7

negative declaration. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(3).)" (*Communities for a Better Environment, supra,* 48 Cal.4th at p. 319.)

In CEQA cases, the question of whether the evidence is sufficient to create a fair argument the proposed project will have a significant environmental impact and thus require an EIR is a question of law subject to de novo review. (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939 (*Wollmer*).) "'When a challenge is brought to an agency's determination an EIR is not required, "the reviewing court's 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed "fair argument" could be made.'" [Citation.]' (*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 150–151 [39 Cal. Rptr. 2d 54].)" (*Wollmer, supra,* 179 Cal.App.4th at p. 939.)

"Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified. [Citation.] The burden is on the petitioner to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." (*League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 904 (*League for Protection of Oakland*).) Because the "fair argument" standard derived from section 21151 mandates the preparation of an EIR in the first instance "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact" (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal. 3d 68, 75; *League for Protection of Oakland, supra,* 52 Cal.App.4th at p. 904), as long as there is evidence of such impact, "contrary evidence is not adequate to support a decision to dispense with an EIR." (*Id.* at pp. 904-905.) Thus, section 21151 "creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted." (*League for Protection of Oakland*, supra, 52 Cal.App.4th at p. 905, citation omitted.)

8

In other words, "'when the reviewing court: "perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed 'in a manner required by law.'" [Citation.]" (*League for Protection of Oakland, supra,* 52 Cal.App.4th at p. 905.)

"To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis. According to an administrative guideline for CEQA's application, the baseline 'normally' consists of 'the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced . . . .' (Cal. Code Regs., tit. 14, § 15125, subd. (a).)" (*Communities for a Better Environment, supra,* 48 Cal.4th at p. 315.)

**Fire Equipment Access.**

Scivally asserts that the project will have adverse effects on fire safety for the neighboring building. His position, however, is supported only by his argument that, "In a recommendation the City failed to disclose, its own Fire Chief said Throop Alley was too narrow for fire equipment to access the building at 909 El Centro." The problem with this argument is that Scivally has misstated the record.

Scivally says when he appealed the Planning Commission's decision to the City Council, he argued the Expanded Project would impermissibly narrow Throop Alley to 15 feet in violation of the 20-foot requirement set forth in Fire Code section 503.2 He says a member of the City's planning department then raised the issue with the Fire Chief and reported back to his department head in an email three days later (on August 15, 2011), stating: "The Fire Chief just advised that 909 needs 20' as it's an interior lot. The FD needs two places to fight a fire from (in this case, the alley + the front.) 923 doesn't, as the FD can fight a fire from the front or the side. [¶] The FD didn't specify 20' as part

9

of the 909 Conditions of Approval in 2005, but maybe PW required this on their behalf? Sam was dubious that PW would require a 20'-wide alley; he thinks the average alley in the city is more like 15'.)  [¶]  The proposed project thus meets the FD's requirements."

Scivally notes that the Fire Chief stated that 923 El Centro would not require a 20-foot alley if the Expanded Proposal was built, but says the Fire Chief did not say his department would still be able to adequately protect 909 once the surface parking lot adjacent to Throop Alley was no longer available and the City failed to disclose that the Fire Chief had said Throop Alley was too narrow to access 909 El Centro.

The record indicates that Section 503.1.1 of the 2010 California Fire Code requires that fire apparatus access roads must be able to reach within 150 feet of all portions of the first story of a building; a 20-foot fire lane would only be required if fire apparatus could not reach within 150 feet of a building from public roads.  In addressing the City Council, the City Attorney explained the interplay between Section 503.1.1 and 503.2 which would only require a 20-foot width "if any point of the building is not within 150 feet of where a fire truck can go."  "[I]f a fire lane was needed down there and the Chief says it wasn't for 909, then it would have been required at that time [of the approval of the 909 El Centro project] and it would have been the required width for the fire lane."  The record demonstrates that, at the City Council, the Fire Chief stated that the *existing* condition of Throop Alley is sixteen feet behind 909 El Centro because the gas meters extend into the alley by about four feet, and confirmed that the fire department had not required a fire lane behind 909 El Centro.  The Fire Chief further described the existing alley with an approximate 15-foot width as "pleasant compared to some of the [narrower] ones we have to go down" in other parts of the City.

Pursuant to CEQA, "environmental impacts should be examined *in light of the environment as it exists* when a project is approved."  (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 370 (*Eureka Citizens*), italics added; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1280; 14 Cal. Code

10

Regs. § 15360 [environment is existing physical conditions that will be impacted by a project].) Notwithstanding the "low threshold" specified by section 21151, Scivally has failed to identify any evidence in the record to support a fair argument the project creates a significant environmental impact. (*League for Protection of Oakland, supra,* 52 Cal.App.4th at p. 904 [it is the petitioner's burden "to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact"].) Instead, the record demonstrates that the project does not change any existing conditions in the alley—its width in particular—and therefore does not support a fair argument the project will result in a significant environmental impact within the meaning of CEQA. Scivally has not demonstrated that the City abused its discretion in preparing a negative declaration on the record presented. (*Wollmer, supra,* 170 Cal.App.4th at p. 939, citation omitted [our role "is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made"]; *League for Protection of Oakland, supra,* 52 Cal.App.4th at p. 905.)

**Traffic Hazards.**

Next, Scivally argues the expanded project would exacerbate traffic hazards, arguing the alley was already dangerous to pedestrians and would become even more so with increased traffic and decreased space and visibility. As to his first premise that the alley as it already exists is too narrow, preexisting conditions do not suffice. "An EIR is required on any project that 'may have a significant effect on the environment.' (§§ 21100, subd. (a), 21101, 21151, subd. (a).) A '"[s]ignificant effect on the environment" means a substantial, or potentially substantial, *adverse change in any of the physical conditions* within the area affected by the project . . . .'" (Cal. Code Regs., tit. 14, § 15382, italics added.)" (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th at p. 1615.) "To require an EIR in the present context, where the proposed project is challenged on the basis of preexisting environmental conditions rather than an adverse change in the environment would impose a requirement

11

beyond those stated in CEQA or its guidelines, and is thus prohibited." (*Ibid.*, citation and internal quotations omitted.)

Further, the evidence was that the City required the project to provide primary access through a new entrance and exit on Meridian Avenue; the alley is designed for vehicular and not pedestrian travel. (See Veh. Code, § 110 [an "'Alley' is any highway having a roadway not exceeding 25 feet in width which is primarily used for access to the rear or side entrances of abutting property . . . ."] & § 590, italics added [a street or highway "is a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of *vehicular* travel"]). Again, because Scivally points to no evidence, traffic study or otherwise, of increased danger in the area affected by the project, he has not demonstrated that the City abused its discretion in preparing a negative declaration on the record presented. (*Wollmer, supra,* 170 Cal.App.4th at p. 939, citation omitted; *League for Protection of Oakland, supra,* 52 Cal.App.4th at p. 905.)

**Live-Work Units.**

Scivally argues the developer took advantage of a "loophole" in the law such that the proposed live-work units—while in compliance with the Mission Street Specific Plan—would permit the use of a "creative" parking system and speculates this would mean nine more cars parking on the street. According to Scivally, by enacting the Mission-Meridian parking permit program and distributing parking tags to local residents and businesses to identify cars permitted to park in the area and prevent commuters from parking in neighborhood spaces all day, the City has already acknowledged a parking problem.

According to the record, the Mission Street Specific Plan requires four parking spaces per 1,000 square feet of commercial floor area ("office space") and one space per

12

"live/work" unit.[4]  The project involved the demolition of an existing 2,067 square foot former veterinary clinic and the construction of a new mixed-use commercial building with 1,577 square feet of office space on the first floor (requiring six parking spaces) plus two live/work units totaling 2,811 square feet combined on the second floor (requiring two spaces), with nine parking spaces provided behind the building (as well as on-site storage for four bicycles). (AR 174)~ In other words, the project was required to include eight parking spaces, but provided an additional space for a total of nine parking spaces. The site is also close to a Metro Gold Line station.

Because the total square footage of the new building is 4,388 square feet and 18 parking spaces (four per 1000 square feet) would be required if all of the space was commercial office space, Scivally argues allowing nine spaces for the project allows nine spaces too few.  Once again, however, Scivally relies on speculation and unsubstantiated conjecture alone—not evidence—apparently presuming that the live-work units will not actually be used as live/work units and that the project will not comply with the terms of the conditional use permit or the applicable provisions of the City's Municipal Code. Once again, therefore, in the absence of any evidence to support a fair argument the inclusion of live/work units in the project will result in a significant environmental impact, Scivally has failed to demonstrate that the City abused its discretion in issuing a

---

[4]      As conditions of approval, the project was prohibited from converting the live/work units (which included kitchen and bathroom spaces) to install cubicles or partitions or otherwise convert the units into office space; at least one of the full-time workers of the business associated with the live/work unit "shall reside in the live/work unit[;]" and the "residential space in each live/work unit may not be rented separately from the work space."  In addition, "the two live/work units in the subject property will not be owned separately[;]" the units are to be owned by the owner of the rest of the building.

negative declaration on this record.[5]  (See *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 697 (scarce parking is a social inconvenience, not an environmental impact); *Lucas Valley Homeowners Ass'n v. County of Marin* (1991) 233 Cal.App.3d 130, 155 ["While unquestionably the proposed use would generate some traffic impact, the test is whether the impacts are potentially detrimental or significant"].)[6]

## DISPOSITION

The judgment is affirmed.  The City is to recover its costs on appeal.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**                                        **SEGAL, J.**[*]

---

[5]     To the extent Scivally also asserts "[e]ven if none of [his] arguments carries the day individually, collectively they must," the argument is similarly unsupported by any evidence and necessarily fails as a result.

[6]     At oral argument, Scivally (through counsel) expressly conceded an additional argument raised in his appellate briefing regarding defective notice was in error and abandoned it.

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14